PUBLISH

**F I L E D**
United States Court of Appeals
Tenth Circuit

MAR 16 2000

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**PATRICK FISHER**
**Clerk**

---

IMC KALIUM CARLSBAD, INC.,

Plaintiff - Appellee,

v.

INTERIOR BOARD OF LAND
APPEALS; BUREAU OF LAND
MANAGEMENT; BRUCE BABBITT,
Secretary of the Interior,

Defendants,

YATES PETROLEUM CORPORATION
and POGO PRODUCING COMPANY,

Defendants - Appellants.

No. 99-2047

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-97-1524-JC/RLP)**

---

Ernest L. Carroll, Losee, Carson, Haas & Carroll, P.A., Artesia, New Mexico
(Gregory J. Nibert, James A. Gillespie, Hinkle, Cox, Eaton, Coffield & Hensley,
L.L.P., Roswell, New Mexico, with him on the briefs), for appellants.

Charles C. High, Jr. (Cynthia S. Anderson with him on the brief), Kemp, Smith,
Duncan & Hammond, P.C., El Paso, Texas, for appellee.

---

Before **HENRY**, **ANDERSON**, and **LUCERO**, Circuit Judges.

**ANDERSON**, Circuit Judge.

---

This controversy arises from an August 20, 1992, auction by the Bureau of Land Management ("BLM") of a potassium lease on 5,280 acres of federal land in New Mexico. The BLM rejected, for alleged bad faith, the high bid of defendants Yates Petroleum Company and Pogo Producing Company ("Yates/Pogo") who bid together.[1] The BLM awarded the lease to the next highest bidder, IMC Kalium Carlsbad, Inc. ("IMC"). On appeal by Yates/Pogo, the Interior Board of Land Appeals ("IBLA") reversed the BLM's decision and ordered the lease awarded to Yates/Pogo. IMC then filed this suit in federal district court challenging that decision. The district court reversed the IBLA and reinstated the original lease award by the BLM. Defendants Yates/Pogo appeal, alleging that the district court failed to accord the required deference to the decision of the IBLA as the authorized representative of the Secretary of the Interior ("Secretary"). We agree and hold that under the governing standard of review, the IBLA's decision must be upheld because it is supported by substantial evidence and is not arbitrary or capricious. Accordingly, we reverse the decision of the district court.

---

[1]Yates and Pogo agreed that each would own 50 percent of the lease.

## I. BACKGROUND

Potassium, or "potash," is used in fertilizer. Sylvinite and langbeinite are two types of potash ore, with langbeinite commanding a higher price. The potassium lease at issue includes the right and duty to recover potash from 5,280 acres[2] of federal land in Eddy County, New Mexico.[3] This region in southeast New Mexico, near Carlsbad, contains both potassium and oil and gas reserves. IMC has substantial potash mining operations in the region. Yates holds oil and gas leases in sections 11 and 14, and Pogo holds oil and gas leases in section 23 of the disputed potash lease area. The lease area includes potash ore in four ore zones: the tenth, eighth, fourth, and second. See BLM Lease Offer Statement, Appellants' App. Vol. I at 305. The fourth and the tenth ore zones have the most economic potential. The fourth ore zone extends to sections 11 and 14 and contains potash as langbeinite. The tenth ore zone underlies sections 14 and 23

---

[2]As the district court noted, "a cursory perusal of 30 U.S.C. § 283 appears to indicate a statutory limit of 2,560 acres for competitive potassium leases." IMC Kalium Carlsbad, Inc. v. Babbitt, 32 F. Supp. 2d 1264, 1277 n.14 (D.N.M. 1999). Because neither party addressed the limit's applicability to this lease, we do not consider the issue.

[3]The lease parcel is New Mexico Principal Meridian, Township 22 South, Range 31 East, section 3 south ½; section 4 south ½; section 5 north ½ of the south ½ and north ½ of the south ½ of the south ½; all of sections 8 to 11 inclusive; section 13 southwest ¼ and south ½ of the northwest ¼; section 14; section 23; section 24 northwest ¼; and section 26 north ½ of the north ½. See Notice of Potassium Lease Sale, Parcel 2, Appellants' App. Vol. I at 302.

and, to a lesser extent, section 11 and contains predominantly sylvinite with some langbeinite.

Given the competing interests in the area, the Secretary issued an order to "protect the rights of the oil and gas and potash lessees and operators."  See Oil, Gas & Potash Leasing and Development Within the Designated Potash Area of Eddy & Lea Counties, New Mexico, 51 Fed. Reg. 39,425 (1986) ("1986 Order").[4] The 1986 Order requires oil and gas leases and potash leases to include parallel stipulations that:

> Drilling for oil and gas shall be permitted only in the event that the lessee establishes to the satisfaction of the authorized officer, [BLM], that such drilling will not interfere with the mining and recovery of potash deposits, or the interest of the United States will best be served by permitting such drilling.
>
>     . . . No wells shall be drilled for oil or gas at a location which, in the opinion of the authorized officer, would result in undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash deposits.
>
>     . . . .
>
>     . . . no [potash] mining or exploration operations shall be conducted that, in the opinion of the authorized officer, will constitute a hazard to oil or gas production, or that will unreasonably interfere with orderly development and production under any oil or gas lease issued for the same lands.

---

[4]The 1986 Order updates and replaces previous orders by the Secretary regarding the New Mexico potash area.

Id. The 1986 Order also clarifies that, with certain exceptions: "It is the policy of the Department of the Interior to deny approval of most applications for permits to drill oil and gas test wells from surface locations within the potash enclaves." Id. Potash enclaves are defined as areas "where potash ore is kown [sic] to exist in sufficient thickness and quality to be mineable under existing technology and economics." Id. The exceptions allow the creation of drilling islands within potash enclaves and drilling in barren areas within the enclaves. See id. at 39425-26.

In 1991, Yates/Pogo filed applications for permit to drill ("APDs") with the BLM for the oil and gas leases in Sections 11, 14, and 23 (areas included in the potash lease).[5] In support of Pogo's APDs for oil and gas development, George Warnock, Mining and Geological Consultant, submitted two affidavits to the BLM.[6] Mr. Warnock stated that "[a]s the only mixed ore processor in the Carlsbad Potash District, only IMC could mine in the" disputed lease area and

---

[5]Section 11 contains six producing oil and gas wells and eight appealed APDs; Section 14 contains three producing oil and gas wells and one appealed APD; and Section 23 contains four producing oil and gas wells and twelve appealed APDs. See Appellants' App. Vol. I at 354.

[6]The Warnock affidavits are entitled Report and Economic Analysis of the Carlsbad Potash District in the New Lease Application Area for Submission to the State Director, Bureau of Land Management, New Mexico State Office, Mar. 17, 1992, see Appellant's App. Vol. I at 316, and Response to "Decision" Denial of Application for Permit to Drill (APDs) in the Secretary's Oil Potash Area, Sept. 16, 1992, see Appellants' App. Vol. I at 283.

that the "area probably will never be mined but if it is, this will certainly only be some 30 years hence." See Appellants' App. Vol. I at 288-89. He based his evaluation on the current potash mining companies in the area, their current accessible reserves, and estimates of the minimum thickness of potash ore to economically justify mining in the disputed area. He noted that IMC is the only operator in the area that currently processes mixed sylvinite and langbeinite ore, like that found in the tenth ore zone of the disputed area. Mr. Warnock's analysis did not evaluate the economics of any potash development by Yates/Pogo. By a series of decisions in 1992, the BLM denied the APDs on the basis that the potential oil and gas wells were in potash ore zones and that drilling could lead to waste of potash. Yates/Pogo appealed the APD denials, which are still pending before the IBLA.

On April 30, 1991, IMC requested that the BLM offer potassium leases in the area by competitive sale. In July 1992, the BLM published a Notice of Potassium Lease Sale to be held August 20, 1992.[7] On August 12, 1992, after Yates/Pogo mining and geologic consultants Gary Hutchinson and Leo Lammers evaluated the BLM data on the potassium lease sale, Hutchinson wrote to Randy Patterson, Yates' land manager and corporate secretary:

---

[7]The Notice was published in the Carlsbad Current-Argus on July 24, 31, and August 7, 1992. See Cantwell Aff., Appellee's Supp. App. Vol. III at 494.

I encourage you to continue to pursue approval to bid on the Potash Leases August 20.

The root of Yates['] problem getting approvals for drilling within the potash area is the BLM's outdated economic data, disinterest in commerciallity [sic] of potash, and mandate to protect potash mines. The economically troubled potash industry is, of course, prodding the BLM to "do its job."

The outlines of known potash deposits . . . are much smaller than the BLM will show using their very low cut-off grades. However, if a reasonable mineral exploration company has the leases and drills some core holes for tonnage and grade information then performs feasibility studies using real world data, the BLM personnel will be disarmed with facts and science thereby aiding Yates['] ability to obtain drilling approvals within the lease sale area.

There must be an amount of investment that makes bidding on potash cost effective relative to legal action which at best will only cover up but not fix the drilling approval problem.

Appellants' App. Vol. II at 405.

The BLM offered the potash lease by competitive sale. In writing and orally at the auction, the BLM informed participants, as required by 43 C.F.R. § 3535.3-3(f), "that the Secretary reserves the right to reject any and all bids, and the right to offer the lease to the next qualified bidder if the successful bidder fails to obtain the lease for any reason." At oral auction, on August 20, 1992, Yates/Pogo made the highest bid of $6.00 per acre with IMC dropping out after a bid of $5.15 per acre.[8]

---

[8]The other parcel (Parcel 1) offered at the auction is not involved in this
(continued...)

## A. *BLM Decision*

On October 22, 1992, the Deputy State Director, Lands and Minerals, of the BLM New Mexico State Office rejected Yates/Pogo's bid by letter decision. The decision focused on the statements by Mr. Warnock, on behalf of Yates/Pogo prior to the lease auction, asserting that IMC is the only company that can mine the tenth ore zone. The BLM stated:

> We conclude the area can be mined. Not mining this area for potash would result in undue waste of potash.
>
> . . . The statement by Mr. Warnock on behalf of the applicants, that the lessee does not intend to develop the deposit exhibits bad faith. . . . Despite the applicants' interest in acquiring the lease, the applicants have expressed no desire to mine, joint venture or otherwise promote potash development.

Appellants' App. Vol. I at 246.

Yates/Pogo requested reconsideration of the BLM decision; submitted supplementary information, including maps, reports, and notes of consultants Lammers and Hutchinson; and met with BLM officials to show Yates/Pogo's good faith to develop the potash lease. The BLM rescinded its October 22, 1992, decision so that it could consider the supplementary materials. In the materials, Yates/Pogo argued to the BLM that their "bid on the potassium lease was made in good faith with every intention of allowing potash development to occur

---

[8](...continued)
dispute.

simultaneously with oil and gas development should the potash resources therein be determined to exist in economic quantities and quality." Letter from Gregory J. Nibert, Yates/Pogo attorney, to Larry L. Woodard, BLM State Director 4 (Nov. 19, 1992), Appellant's App. Vol. I at 281.      Yates further explained to BLM that:

> Frustrated by the regulations that unilaterally allowed potash mining companies and BLM representatives to arbitrarily withdraw oil and gas exploration areas from use by the oil and gas lessees as well as the requirements that hold all potash exploration and mining information confidential, Yates and others embarked on a program to develop potash mining information from public sources. The knowledge developed from this program would allow Yates to make an independent determination as to whether oil and gas exploration could be safely and economically conducted in the same area as potash mining.
>
>        Pursuant to that endeavor, Yates hired independent consultants, lawyers and experts knowledgeable in both mining and oil and gas operations to determine the feasibility for both industries to coexist in the [potash area].
>
>        . . . .
>
>        . . . The result of the evaluation of potash potential in the lease sale area was a strong recommendation by Yates experts to bid on [the potash lease].

Appellants' App. Vol. II at 355-57.  On January 5, 1993, the BLM again rejected the Yates/Pogo bid.  The Decision stated that:

> we conclude that the bid was made in bad faith and not in the best interest of recovery of the potassium resources.
>
>        . . . .

[Yates/Pogo] demonstrate[] two incompatible positions . . . when dealing with appeals of oil and gas APD's to IBLA and when obtaining potassium leases.

. . . .

. . . We find the conflicting statements as evidence of bad faith in that neither company, being oil and gas companies by nature, seriously intends to develop the potassium resources. We also find these statements to be contradictory to the general policy of the [1986 Order], insofar as a company attempts to obtain a potassium lease for the purpose of developing oil and gas resources.

. . . .

. . . Simultaneous development of both resources disregards safety of individuals working in an underground mining environment. . . . During the production life of the [oil and gas] well, petroleum products can migrate into the potash bearing formation and remain in place long after the well is plugged and abandoned. . . .

A significant hydrocarbon release would prompt the . . . Mine Safety and Health Administration (MSHA) . . . [to require] the added expense of equipment, ventilation, testing, and training [that] would place an undue economic hardship on affected potash operations . . . .

Appellants' App. Vol. I at 236-39.

## B. IBLA Decision

On January 27, 1993, Yates/Pogo appealed the BLM's decision to the IBLA.[9]  On February 10, 1997, the IBLA reversed the BLM's decision.  See Pogo Prod. Co., 138 I.B.L.A. 142 (1997).  The IBLA first agreed that there is "no obligation to accept any bid" but held that "the record must disclose a rational basis for the rejection and must be sufficient to establish that the decision was not arbitrary, capricious, or in error."  Id. at 154.  The IBLA found "the record insufficient to support BLM's rationale for rejecting appellants' high bid" and reversed.  Id.  The IBLA denied IMC's rehearing request on September 22, 1997.

## C. District Court Decision

IMC filed suit on November 26, 1997, in the district court, which reversed the IBLA in a January 12, 1999, order.  The court held that "[t]he record provides ample evidence to support BLM's conclusion that award of the lease to Yates and Pogo would not be in the best interest of potash recovery."  IMC Kalium Carlsbad, Inc. v. Babbitt, 32 F. Supp. 2d 1264, 1276-77 (D.N.M. 1999).

---

[9]Under a stipulated settlement in another federal suit to enjoin the BLM from issuing the lease to IMC, the BLM agreed to not issue the lease until Yates/Pogo exhausted their administrative remedies.  However, the BLM issued the lease to IMC due to an alleged administrative error and the court ordered BLM to pay sanctions to Yates/Pogo and to cancel the lease.  See IMC, 32 F. Supp. at 1269 n.7.

## II. ANALYSIS

The hierarchy in this case is that the district court reversed the IBLA's decision, which reversed the BLM's decision. We review, but accord no deference to, the district court's decision. See Mt. Emmons Min. Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997).

Under the Administrative Procedure Act ("APA"), we defer "to the decisions of the Interior Board of Land Appeals, and we will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence." American Colloid Co. v. Babbitt, 145 F.3d 1152, 1154 (10th Cir. 1998) (citing 5 U.S.C. § 706; Hoyl v. Babbitt, 129 F.3d 1377, 1382 (10th Cir. 1997)); see also Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994) (applying standard of review to informal agency action).

This case hinges on two important subsidiary questions that affect our application of the standard of review: (1) when reaching its decision, what weight, if any, must the IBLA accord the findings and decision of the BLM? and (2) what weight, if any, must we accord the findings and decision of the BLM when reviewing the IBLA decision? These questions are pivotal because the district court focused on whether the decision of the BLM, rather than that of the

IBLA, was supported by the evidence.[10] Yates/Pogo contend that such an analysis impermissibly deferred to the BLM. We agree.

The IBLA has de novo review authority over BLM decisions.[11] See National Wildlife Fed'n, 145 I.B.L.A. 348, 362 (1998) (review "is de novo" because IBLA is "delegated responsibility to decide for the Department 'as fully and finally as might the Secretary' appeals regarding use and disposition of the public lands and their resources") (quoting 43 C.F.R. § 4.1). A decision of a subordinate agency division, such as the BLM, does not bind the agency. See Catron v. Babbitt, 955 F. Supp. 627, 630-31 (W.D. Va. 1997); see also U.S. Soil Conditioning v. NLRB, 606 F.2d 940, 944 (10th Cir. 1979).

With respect to our review, we examine both the BLM's and the IBLA's decisions;[12] but, as indicated above regarding our general standard of review, because the IBLA is the final decision maker of the agency, we apply the

_____

[10]The district court stated, "I need only examine evidence presented to the IBLA that could support BLM's asserted reasons for rejecting the Yates/Pogo bid." IMC, 32 F. Supp. 2d at 1272.

[11]Contrary to the district court's note, see IMC, 32 F. Supp. 2d at 1269 n.8, the IBLA's de novo review authority is not limited to formal evidentiary hearings (presumably referring to hearings before an administrative law judge appointed by the IBLA).

[12]Appellant's Motion to Supplement the Record asks this Court to add copies of the leases, well data, and a map of the potash area to the record. Our review must focus on the materials before the IBLA for its decision. Thus, since we have the relevant information considered by the IBLA, we decline to supplement the record and deny the motion.

deferential standard of review to the decision of the IBLA, not of the BLM.[13]  See

Four B Corp. v. NLRB, 163 F.3d 1177, 1182 (10th Cir. 1998) (court must uphold

agency appeals board if supported by substantial evidence; standard of review

does not change when subordinate agency division and appeals board reach

different conclusions); Catron, 955 F. Supp. at 631 (court must uphold IBLA's

decision if supported by substantial evidence); FCC v. Allentown Broad. Corp.,

349 U.S. 358, 364 (1955) (upholding FCC reversal of hearing examiner).

In this case, the IBLA found insufficient evidence to support the BLM's

rejection of a high lease bid for bad faith.  The IBLA decided, therefore, based on

its own review of the record, that the lease should be awarded to the highest

bidder, Yates/Pogo.

Applying these standards, we review the IBLA's decision to determine

whether it was supported by substantial evidence and was not arbitrary or

capricious.

_____

[13]IMC correctly argues that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 50 (1983).  However, instead of looking at the IBLA's reasoning for its decision, IMC urges us to focus on the issue articulated by the IBLA:  whether the record shows "a rational basis for the rejection" of the high bid, Pogo, 138 I.B.L.A. at 154; and thus to review the BLM decision for a rational basis.  With this statement, the IBLA neither relinquished its review authority nor altered the nature of our standard of review.  Our focus is to review the decision of the IBLA to overturn the BLM and award the lease to Yates/Pogo.

## A. The IBLA Decision Was Supported by Substantial Evidence

The IBLA addressed the BLM's findings that: (1) inconsistencies between the Warnock and Hutchinson analyses showed Yates/Pogo's bad faith, (2) Mr. Hutchinson's declaration that the tenth zone was uneconomic rendered the Yates/Pogo bid an undue waste of potash resources, and (3) Yates/Pogo's development of oil and gas would create safety risks and cause an economic hardship on the potash industry. We are unpersuaded by IMC's argument that "[b]y focusing on each factor separately, rather than viewing them as being interrelated, . . . the IBLA failed to fully consider the basis for BLM's decision to reject Appellants' bid." Appellee's Br. at 34. Whether we evaluate the factors separately or together, substantial evidence supports the IBLA's decision, as discussed below.

### 1. Bad Faith

The IBLA stated:

> In our view BLM's conclusion, based on the inconsistencies between the Warnock and Hutchinson submissions, that appellants submitted their bid in bad faith is unwarranted. We do not agree that the reports demonstrate appellants espouse contradictory positions on the economic viability of the potash deposit depending on whether they seek APD approval or potash lease acquisition. Even if the studies did conflict, neither the fact that a later, more comprehensive evaluation specifically designed to evaluate the economic potential of potash lease procurement reached a somewhat different result than an earlier study prepared for a different purpose nor appellants'

-15-

continued reliance on the earlier Warnock study as support for the issues it was commissioned to address, demonstrates bad faith. Rather the two analyses conform to appellants' acknowledged goal of pursuing the profitable development of both oil and gas and potash.

Pogo, 138 I.B.L.A. at 156-57. The record contains substantial evidence to support the IBLA conclusion that the Hutchinson and Warnock reports do not evidence bad faith. The Warnock report calculated a threshold mining thickness necessary to economically mine potash in the lease area. It concluded that the current potash mining companies had more profitable ore reserves to mine for at least thirty years. The Warnock report did not make an evaluation or recommendation with respect to Yates/Pogo's ability to mine the potash. The Hutchinson report focused on the economic potential for Yates/Pogo to develop the potash lease and concluded that the fourth ore zone had economic potential for Yates/Pogo to develop a small mine.

The IBLA may draw reasonable inferences from the evidence. See Worley Mills, Inc. v. NLRB, 685 F.2d 362, 365 (10th Cir. 1982) ("A federal agency's conclusions based upon such inferences are not to be overturned on review unless they lack a reasonable basis."); Adolph Coors Co. v. FTC, 497 F.2d 1178, 1184 (10th Cir. 1974) ("If the inference is supported by substantial evidence, it cannot be set aside even though the court could draw a different inference.") (upholding FTC decision reversing administrative law judge). Thus, because it is supported

-16-

by substantial evidence, we must accept the IBLA's determination that the Warnock and Hutchinson reports do not contradict nor evidence bad faith.

### 2. *Undue Waste of Potash*

The IBLA continued:

> We further reject the claim that awarding the potash lease to appellants would not be in the best interest of recovery of the potassium resources because it would result in the undue waste of potash and could pose an economic hardship on the potash industry. The fact that Hutchinson's analysis identifies as uneconomic some potash ore zones BLM considers commercial does not mean that those zones will be wasted should appellants be awarded the lease.

Pogo, 138 I.B.L.A. at 157. The record contains substantial evidence to support the IBLA's decision. The BLM conceded that: "While the BLM maps designate a greater extent of mineable reserves than the Hutchinson study, BLM considers Mr. Hutchinson's study as reasonable. The BLM also realizes that economic analyses done before mining are subject to considerable change." Olsen Memo., Appellee's App. at 122. Regarding the fourth ore zone, the BLM stated: "More core drilling would be necessary to justify a new mine or develop a detailed mining plan." Cranston Memo., Appellee's App. at 131. The evidence in the record supports the conclusion that Yates/Pogo were not seeking to deceive the BLM, but merely seeking to present the BLM with up-to-date data on the potash reserves of the area. Indeed, the additional data would provide the BLM with a

better sense of the potash mining potential in the area. Thus, given all the evidence in the record, the IBLA did not err in deciding that a determination of undue waste of potash was premature at lease issuance.

### 3. *Safety Concerns*

The IBLA concluded that the BLM's remaining arguments regarding safety concerns (and economic effects of a safety lapse):

> rely on speculation and assume that BLM will fail to fulfill its responsibilities to carefully scrutinize mining plans of operations submitted pursuant to 43 CFR 3592.1 before granting the approval necessary to allow mining to occur. We believe BLM's authority to approve or disapprove APD's and proposed potash mining plans will be adequate to regulate the parties' activities in the area.

Pogo, 138 I.B.L.A. at 157-58. After review of the BLM's decision, we agree with the IBLA that the BLM's conclusion that granting the lease to Yates/Pogo would pose an undue economic hardship on the potash industry relies on speculation about possible safety risks and conjecture about economic ramifications. The record supports IBLA's conclusion that BLM has substantial legal authority to regulate Yates/Pogo's actions under the oil and gas and potash leases to protect the safety of miners.

In sum, we hold that the IBLA's decision was supported by substantial evidence in the record.

-18-

***B. The IBLA Decision Was Not Arbitrary or Capricious***

IMC also claims that the IBLA's decision was arbitrary and capricious.

First, IMC essentially argues that the BLM's decision correctly interpreted the

Secretary's 1986 Order and the IBLA decision violated the Order.  Next, IMC

argues that the IBLA's failure to defer to the BLM's technical expertise was

arbitrary and capricious.  Under the arbitrary and capricious standard, we "must

determine whether the agency considered all relevant factors and whether there

has been a clear error of judgment."  Olenhouse, 42 F.3d at 1574 (citing Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983)).

***1. 1986 Order***

IMC argues, in essence, that the IBLA was arbitrary and capricious because

it incorrectly applied the 1986 Order.[14]  Yates/Pogo respond that, at most, the

IBLA was interpreting the 1986 Order and making policy decisions that only the

IBLA has the authority to make.  We agree that the IBLA is authorized to

---

[14]IMC also suggests, without elaboration or citation of authority, that the IBLA should have deferred to the BLM's interpretation of the 1986 Order, because the BLM is charged with administering the 1986 Order.  We disagree. IMC is only rephrasing its argument that the IBLA should defer to the BLM—an argument that we rejected above.  The Secretary's delegation of authority to administer the 1986 Order to the BLM does not deprive the IBLA, acting for the Secretary, of authority to interpret that order and make policy that binds the BLM.

interpret and apply the 1986 Order, including making policy choices, and that its decision did not exceed those bounds.

The IBLA has authority to consider "whether the [Secretary's] order was properly applied and implemented." Texas Oil & Gas Corp., 46 I.B.L.A. 50, 52 (1980). In the context of this case, our role is not "to decide which policy choice is the better one, for it is clear that Congress has entrusted such decisions to the [agency]." Arkansas v. Oklahoma, 503 U.S. 91, 114 (1992).

As discussed earlier, the 1986 Order enunciates "rules for concurrent operations in . . . production of oil and gas and potash" and establishes parallel restrictions on both oil and gas leases and potash leases so that neither will "cause a hazard" or "interfere with" the development of the other. 1986 Order, 51 Fed. Reg. at 39,425. The BLM stated that Yates/Pogo's attempt "to obtain a potassium lease for the purpose of developing oil and gas resources" is "contradictory to the general policy of the [1986 Order]." Appellants' App. Vol. I at 238. The IBLA rejected this contention:

> While BLM finds the concurrent development of oil and gas incompatible with safe potash recovery, appellants disagree and actively pursue simultaneous development of those resources. Resolution of that disagreement, however, is not necessary in order to settle the issues raised in the present appeal since we find that [the bid was not made in bad faith].

Pogo, 138 I.B.L.A. at 157. The IBLA noted that "some of the issues surrounding the feasibility of simultaneous oil and gas and potash development . . . will be

-20-

addressed in the hearing ordered in [the APD appeal]." Id. at 158 n.13 (citing

Yates Petroleum Corp., 131 I.B.L.A. 230, 235-36 (1990) (referring APD matter

for hearing and decision by administrative law judge)). The IBLA was within its

authority when it concluded that awarding the lease to Yates/Pogo would not

violate the 1986 Order.

Accordingly, we conclude that the IBLA's decision did not violate or

otherwise misapply the 1986 Order and, therefore, was not arbitrary and

capricious on that ground.

### 2. *Agency Expertise*

Finally, IMC argues that the IBLA decision was arbitrary and capricious

because it failed to defer to the BLM's determinations of technical matters.[15] We

disagree. The IBLA may choose, but is not obligated, to defer to the BLM's

technical determinations. See Deschutes River Landowners Comm., 136 I.B.L.A.

105, 110 (1996). We defer to the IBLA's determinations (not that of the BLM) in

areas of its experience and expertise if supported by the record. See e.g.,

Colorado Pub. Util. Comm'n v. Harmon, 951 F.2d 1571, 1579 (10th Cir. 1991)

---

[15]As indicated by our analysis above, we are unpersuaded by IMC's other arguments, including the contention that the IBLA failed to sufficiently consider the evidence and explain its decision.

(court should defer to agency's expertise). We defer to the IBLA's technical determinations and hold that the IBLA decision was not arbitrary and capricious.

### III. CONCLUSION

The IBLA reasoned that the issue of simultaneous development under the 1986 Order would be properly decided in the separate APD proceeding and that the BLM had adequate authority to regulate the mining plans of Yates/Pogo under the potash lease and drilling under the relevant oil and gas leases.[16] The IBLA decision ordered the BLM to honor the high bid in this case. For the reasons stated above, because the IBLA's decision was based on substantial evidence and was not arbitrary and capricious, we conclude that it must be upheld. Accordingly, the decision of the district court is REVERSED.

---

[16]We note that the BLM can enforce Yates/Pogo's obligations under the leases. See 43 C.F.R. §§ 3509.4-2, 3598.4 (giving the BLM authority to issue enforcement orders and institute legal proceedings to cancel lease if lessee fails to comply with regulations).