**CENTER FOR BIOLOGICAL DIVERSITY, et al, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR, et al, Defendants.**

**No. CV 01–1758–PHX–ROS.**

United States District Court, D. Arizona.

March 31, 2003.

Roger Flynn, Jeffrey C. Parsons, Boulder, CO, for plaintiff.

Sue A. Klein, Cynthia M. Parsons, Paul Kipp Charlton, U.S. Attorney's Office, Phoenix, AZ, Edward S. Geldermann, U.S. Dept. General Lit. Section, Washington, DC, for defendant.

Homer Barry Holt, Jerry L. Haggard, Gust Rosenfeld PLC, Phoenix, AZ, Scott Harrold Thomas, ASARCO Inc., Phoenix, AZ, for intervenor.

## ORDER

SILVER, District Judge.

Pending before the Court are cross-motions for summary judgment. Plaintiffs Center for Biological Diversity, Western Land Exchange Project, and the Sierra Club are seeking judicial review of an administrative decision of the United States Bureau of Land Management approving a land exchange between the federal government and ASARCO, Inc. ("ASARCO"). On Feb. 20, 2002, the Court granted ASARCO's motion to intervene as a Defen-

dant [Doc. # 20]. On March 7, 2002, Plaintiffs filed a Motion for Summary Judgment [Doc. # 22]. On March 8, 2002, Defendants United States Department of Interior and Bureau of Land Management ("Federal Defendants") filed Federal Defendants' Motion for Summary Judgment [Doc. # 38]. On March 8, 2002, ASARCO filed a Motion to Dismiss, Motion for Stay, and Motion for Summary Judgment [Doc. # 24]. As explained below, the Court will dismiss one of Plaintiff's claims as unripe and stay the remaining claims pending further action by the Interior Board of Land Appeals. Therefore, the Court will deny Plaintiffs' Motion for Summary Judgment, and grant in part Federal Defendants' and ASARCO's motions for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a proposed land exchange between ASARCO and the federal Bureau of Land Management (BLM). ASARCO seeks to acquire 10,976 acres of currently public lands (the "selected lands") in exchange for 7,300 acres of private land currently owned or offered by ASARCO. PSOF ¶ 3. The selected lands consist of 31 parcels of public lands located in Pinal and Gila Counties. PSOF ¶ 13. The majority of the parcels are located near ASARCO's Ray Mine Complex. PSOF ¶¶ 3, 13. Though the selected lands are public, ASARCO currently holds 747 unpatented mining claims on the land near the Ray Mine Complex. PSOF ¶¶ 15, 19; DSOF ¶ 3.

ASARCO proposed the land exchange in its present form in 1997, and the BLM conducted an administrative review pursuant to the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* PSOF ¶ 13. Pursuant to NEPA, the BLM prepared an Environmental Impact Statement (EIS) to evaluate the environmental effects of the land exchange. A draft EIS was published on October 26, 1998, and, after public comment, the BLM issued a final EIS in June 1999. DSOF ¶ 23, 24 On April 27, 2000 the BLM issued a Record of Decision (ROD) approving the land exchange with ASARCO. PSOF ¶ 14. On June 28, 2000, Plaintiffs filed a protest with the BLM Arizona State Director contesting BLM's approval of the land exchange, which was denied on May 18, 2001. PSOF ¶ 11; DSOF ¶ 67.

As a related matter, in order to facilitate the land exchange, the BLM also adopted amendments to the BLM's Phoenix and Safford District Resource Management Plans (the "Plan amendments"). Resource Management Plans do not themselves mandate specific policies or actions, but they govern the type of actions that are allowed on federal lands. In order to transfer the selected lands to ASARCO, it was necessary to amend the Resource Management Plan for the Phoenix and Safford Districts, which cover the selected lands. DSOF ¶ 16. As finally approved, the Plan amendments changed the land tenure classifications of approximately 10,339 acres of the selected lands from "retention" to "disposal." PSOF ¶ 14. However, the Plan amendments also provided that the land *use* would not change *unless* the ASARCO land exchange was approved. The final Record of Decision stated that "unless [a land] exchange is approved, the areas affected by the plan amendment will continue to be managed as multiple-use lands under [FLPMA]" DSOF ¶ 54. The Environmental Impact Statement evaluated the environmental impact of the Plan amendments in conjunction with the proposed land exchange. DSOF ¶ 20. Unlike the land exchange decision, the decision on the Plan amendments was *not* appealable.

On July 11, 2001 Plaintiffs filed an administrative appeal and a request for a

stay of BLM's land exchange decision to the Interior Board of Land Appeals (IBLA). PSOF ¶ 12. The IBLA did not grant a stay within the time period contemplated by 43 C.F.R. § 4.21(b)(4), which provides in part, "[A]n Appeals Board shall grant or deny a petition for a stay pending appeal ... within 45 calendar days of the expiration of the time for filing a notice of appeal." The expiration of the time for filing a notice of appeal was on or about July 18, 2001, and therefore the 45–day time limit ran on or about September 3, 2001. PSOF ¶ 11. On September 18, 2001, the IBLA had still not issued a decision on a stay, and Plaintiffs filed this lawsuit, challenging the land exchange decision on the same grounds pending before the IBLA. PSOF ¶ 12. On November 1, 2001, however, the IBLA granted Plaintiffs' request for a stay pending review of the BLM's land exchange decision. PSOF ¶ 12.

## II. LEGAL ANALYSIS

### A. Overview of Plaintiffs' Claims

Plaintiffs request that the Court find that the BLM's Record of Decision (ROD) approving the land exchange and Plan amendments violated federal law. They also challenge the legality of the Environmental Impact Statement (EIS) prepared in conjunction with the ROD. The ROD relied upon the EIS in determining whether the change in land usage was in the "public interest." The BLM's decisions and the preparation of the EIS are governed by the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*

The crux of Plaintiff's argument is that both the EIS and ROD are flawed because the BLM misapplied a different law, the General Mining Law of 1872, in issuing the EIS and the ROD. Specifically, in both the EIS and ROD, the BLM concluded that the environmental effects upon the proposed lands would be the same *whether or not* the land exchange was approved. The BLM reached this conclusion because AS-ARCO already has 747 unpatented mining claims on the lands currently in BLM control. The BLM determined that, under the General Mining Law, ASARCO has a right to pursue its mining claims on federal land whether or not the exchange is approved. Therefore, BLM concluded that the land exchange will have no environmental impact beyond the *status quo.* *See* Administrative Record at 470, 559. Plaintiffs contend that the BLM misapplied the Mining Law, and that ASARCO would not legally be able to conduct mining on the selected lands if the BLM retained control. Plaintiffs argue that the BLM's analysis of mining rights resulted in a flawed EIS and ROD, in violation of the requirements of the FLPMA and NEPA.

### B. The Land Exchange Decision

#### (1) The decision of the BLM became final

As an initial matter, the Court must determine if Plaintiffs have exhausted their administrative remedies concerning the BLM land exchange decision. The Court concludes that Plaintiffs exhausted their administrative remedies under the Department of Interior's own regulations before filing suit.

Under the provisions of 43 C.F.R. § 4.21, the BLM's decision became "final" once the IBLA did not grant a stay within 45 days of the expiration of the time for filing a notice of appeal. Initially, the BLM decision "became effective" on September 3, 2001, at the end of the 45–day statutory time period. 43 C.F.R. § 4.21(a)(3) provides that, "A decision ... for which a stay is not granted will become

effective immediately after the Director or an Appeals Board ... fails to act on the petition within the time period specified in paragraph (b)(4) of this section." Section (b)(4) provides that, "The Director or an Appeals Board shall grant or deny a petition for a stay pending appeal ... within 45 calendar days of the expiration of the time for filing a notice of appeal." Thus, after the expiration of the 45–day time period, the decision "became effective."

Section 4.21(c) further provides, "No decision ... shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. § 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(3) of this section...." Thus, whether a decision is "final" for the purposes of the Administrative Procedure Act turns on the narrow statutory definition of a decision becoming "effective." This interpretation comports with the Director's own understanding of the provisions in question: "The primary consequence of IBLA failing to rule upon a stay request within 45 days is that the decision becomes effective. In addition, the decision becomes subject to judicial review under 5 U.S.C. § 704." *David H. Burton,* 11 OHA 117, 125 (1995) (citations omitted).

■ In response, Defendants argue that the grant of a stay on November 1, 2001 rendered the BLM decision not "effective" within the meaning of § 4.21, and therefore not "final." This argument misunderstands the precise definition of a decision becoming "effective" under § 4.21, which does not take into account any stays filed after the 45–day time period. This result is explained by the Director's decision in *David H. Burton,* which held the IBLA has the inherent authority to issue stays at any time, notwithstanding the 45–day time period in § 4.21. The Director explained that § 4.21 is not a grant of authority to

issue stays, but rather the "IBLA's authority derives from authority delegated to the President and the Secretary of the Department of the Interior by Congress." *Burton,* 11 OHA at 120. In this case, the IBLA exercised its authority to issue a stay outside the 45–day time period contemplated by § 4.21. However, the result of waiting longer than 45 days is that the decision became "effective" and therefore "final." *Burton,* 11 OHA at 125.

Defendants also argue that the Administrative Procedure Act ("APA") contains separate requirements for exhaustion of remedies before a decision should be subject to judicial review. As the Supreme Court has explained, "Congress effectively codified the doctrine of exhaustion of administrative remedies in § 10(c) [of the APA]." *Darby v. Cisneros,* 509 U.S. 137, 153, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Section 10(c) of the APA, codified as 5 U.S.C. § 704, provides that final agency actions are "subject to judicial review." It further provides in relevant part that "agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application, ... unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency." *Id.* The Supreme Court has interpreted the language more clearly, holding that "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Darby,* 509 U.S. at 154, 113 S.Ct. 2539.

In this case, the BLM decision became "final" and subject to judicial review under § 704 once the 45–day time limit for a stay expired. This interpretation is supported by the text of 43 C.F.R. § 4.21(c) (labeled

"Exhaustion of administrative remedies"), which provides, "[n]o decision ... shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. § 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided...." The *Burton* decision supports this interpretation as well: "The primary consequence of IBLA failing to rule upon a stay request within 45 days is that the decision becomes effective. In addition, *the decision becomes subject to judicial review under 5 U.S.C. § 704.*" *David H. Burton,* 11 OHA at 125 (emphasis added). Further, at the time the suit was filed, the IBLA had not granted a stay, and therefore the decision was not "inoperative" under the APA. Nevertheless, Defendants contend that the IBLA's untimely stay divested the Plaintiffs of their ability to pursue the case properly filed in federal court and divested the Court of authority to hear the case properly before it.

The Court concludes that the IBLA has no authority to make a decision "non-final," thereby stripping a federal court of its right to hear a case and disrupting the settled expectations of Plaintiffs, once a BLM decision becomes final under *its own* regulations. The Department of the Interior is obligated to follow its own regulations, which specifically define when a decision is "final" for judicial review. These are the rules to which the agency first gives notice of to the public and then commands adherence to by the public. It would be a terrible injustice if the agency could escape compliance with the same rules it strictly imposes on the public. The fact that the government possesses the authority to alter or revoke the regulation, or to issue a stay notwithstanding the text of the regulation, does not give it the authority to flaunt the commands of the regulation as long as it is in force. *See United States v. Nixon,* 418 U.S. 683, 695–6, 94 S.Ct. 3090, 41 L.Ed.2d 1039 ("So long as this [administrative] regulation is extant it has the force of law.... [I]t is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority. But he has not done so. So long this regulation remains in force the Executive Branch is bound by it ...."); *Baker v. United States Dep't of Agriculture,* 928 F.Supp. 1513, 1524 (D.Idaho 1996) ("It is a well-established rule that an agency is bound to follow the regulations it issues. Those under the agency's jurisdiction have a right to insist that the agency adhere to its own rules.") (citations omitted). Were the IBLA to have this authority, there would be no limit to its power to disrupt the settled expectations of Plaintiffs to seek recourse to the federal courts, merely by granting a stay at any point in the federal proceedings. The IBLA cannot have such unbridled authority over Plaintiff's access to the Court, and, by the terms of 43 C.F.R. § 4.21, the Department of the Interior has circumscribed that authority to ensure that a decision becomes final at a fixed, definable time.[1]

Finally, contrary to the federal government's understanding, *Bennett v. Spear,*

---

1. At least one court has questioned whether a plaintiff needs to exhaust administrative remedies under the APA *at all* where the agency retains such discretionary power to grant a stay. *See Oregon Natural Desert Ass'n v. Green,* 953 F.Supp. 1133, 1141–2 (D.Or.1997) (holding exhaustion not required under § 4.21 where grant of stay is discretionary). In *Idaho Watersheds Project v. Hahn,* 307 F.3d 815, 828, n. 5 (9th Cir.2002), the Ninth Circuit questioned, but did not decide, whether a discretionary stay under § 4.21 could render a decision "inoperative" for the purposes of § 704, thereby requiring administrative exhaustion. In this case the BLM decision was final and subject to judicial review under the agency's own regulation at the time the suit was filed, and therefore the Court need not determine whether the untimely discretionary

520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), does not change the evaluation of when the BLM's action became final. Bennett held that, "[a]s a *general* matter," an agency action must be the "consummation" of the decision-making process and it must be one by which "rights or obligations have been determined," in order to be "final." *Id.* at 177–78, 117 S.Ct. 1154 (emphasis added). Here, the specific regulation, 43 C.F.R. § 4.21 defines the agency's own understanding of that general proposition, by defining when a decision becomes "effective" and "final" and thus subject to judicial review. The Ninth Circuit cases cited by Defendants apply *Bennett* in the context of agency action which is not subject to an agency regulation defining "finality." *See Ecology Center, Inc. v. United States Forest Service,* 192 F.3d 922, 925 (9th Cir.1999) (holding that forest monitoring is not "final agency action"); *Montana Wilderness Ass'n v. United States Forest Serv.,* 314 F.3d 1146, 1150 (9th Cir.2003) (holding that routine trail maintenance work is not final agency action). Because agency regulations have already defined the "finality" of an action for the purpose of judicial review, both the IBLA and a federal court must defer to the regulation. *See Darby,* 509 U.S. at 154, 113 S.Ct. 2539 ("Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become final under [§ 704]."). Therefore, the BLM decision was final at the time the Plaintiffs brought suit, and the subsequent actions by the IBLA do not create an issue of administrative exhaustion once Plaintiffs properly filed suit in federal court.

**(2) The Court will retain jurisdiction and stay the proceedings**

■ Although the Court will not dismiss the case for failure to exhaust administra-

tive remedies, the Court will stay the proceedings on the legality of the land exchange in order to await the determination of the IBLA. The IBLA has authority to conduct a *de novo* review of the BLM's decision, meaning that, even if it affirms the decision of the BLM, it may do so on different grounds which would render an opinion of this Court meaningless. *See IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals,* 206 F.3d 1003, 1009 (10th Cir.2000) ("The IBLA has *de novo* authority over BLM decisions. A decision of the subordinate agency division, such as the BLM, does not bind the agency."). In fact, in *IMC,* the Tenth Circuit reversed a district court decision which had deferred to the findings of the BLM rather than the findings of the IBLA. *Id.* at 1009–1010 ("we examine both the BLM's and the IBLA's decisions; but ... because the IBLA is the final decision maker of the agency, we apply the deferential standard of review to the decision of the IBLA, not of the BLM").

The Court has inherent discretionary authority to stay the case. "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Leyva v. Certified Grocers of Cal.,* 593 F.2d 857, 863–4 (9th Cir. 1979).

The Ninth Circuit has also articulated policy concerns against conducting parallel administrative and judicial proceedings. In *Acura of Bellevue v. Reich,* 90 F.3d 1403, 1407–8 (9th Cir.1996), the Court emphasized that "[h]aving two bodies simulta-

stay later rendered the decision "inoperative"    under the APA.

neously review an agency action wastes scarce governmental resources. Allowing judicial review in the middle of the agency review process unjustifiably interferes with the agency's right to consider and possibly change its position during its administrative proceedings." *Acura*, 90 F.3d at 1408–9. *See also Idaho Watersheds*, 307 F.3d at 829 (noting, under *Acura*, that a federal court should not "inappropriately interfere with the agency's decision making process before it was completed."). Moreover, as with this case, "[a]n appeal to a higher authority may also obviate the need for judicial review," and "simultaneous review poses the possibility that an agency authority and a court would issue conflicting rulings." *Acura*, 90 F.3d at 1403, 1409.

Here, the IBLA retains specific expertise to inform the Court's final judgment. The IBLA's expertise will be helpful even upon reviewing the evidence in the record, because "[t]he IBLA may draw reasonable inferences from the evidence." *IMC*, 206 F.3d at 1011. Though Plaintiffs argue that the review will only concern application of the law, the process of applying law to the facts requires unique agency expertise. In a similar case, where plaintiffs challenged whether an agency's review of factual information was incomplete, inconclusive, or inaccurate, the Supreme Court noted that "[t]he question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Court further noted that "resolution of this dispute involves primarily issues of fact. Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377, 109 S.Ct. 1851. In particular, Plaintiffs here are challenging the validity of mining and mill-

site claims, a determination for which the IBLA is uniquely suited, and one that may well require expert inferences from the evidence already in the record.

Alternatively, the Court may stay the action pursuant to the doctrine of primary jurisdiction. A stay pursuant to the doctrine of primary jurisdiction is appropriate where an administrative body should have the first word on complex or novel issues. *See United States v. General Dynamics Corp.*, 828 F.2d 1356 (9th Cir.1987). In *General Dynamics*, the Ninth Circuit listed "four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Id.* at 1362. All four factors are present in this case, where the IBLA has an interest both in applying its expertise and establishing a uniform interpretation of the policies under the Mining Law. "[P]rimary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Brown v. MCI WorldCom Network Serv., Inc.*, 277 F.3d 1166, 1172 (9th Cir.2002) (quoting *General Dynamics*, 828 F.2d at 1362). Further, in *United States v. Henri*, 828 F.2d 526 (9th Cir.1987) (per curiam), the Ninth Circuit approved a lower court stay of a case where the government was challenging the validity of mining claims which were independently pending before the BLM. "The procedure that 'has generally been followed when the resolution of a claim cognizable in a federal court must await a determination by an administrative agency having primary jurisdiction' is for the district court to stay the proceedings pending agency action." *Henri*, 828 F.2d at 528 (quoting *United States v. Michigan*

*Nat'l Corp.*, 419 U.S. 1, 4–5, 95 S.Ct. 10, 42 L.Ed.2d 1 (1974)).

As a final note, even if the IBLA affirms the BLM decision, Plaintiffs will not be prejudiced by the delay caused by the stay, because they are merely seeking to retain the *status quo.* In fact, the parties whose interests would most be prejudiced by a delay, the Federal Defendants and Intervenor ASARCO, are the parties requesting the stay.

## C. The Plan Amendments

The question of whether the Court should review the legality of the Plan amendments is distinct from the issue of the Court reviewing the legality of the land exchange. The IBLA does not review Plan amendments, and therefore the parties agree that the decision to amend the Plan is final. Defendants contend that the Plaintiffs lack standing to challenge the Plan amendments, that the issue is not yet ripe, and, in the alternative, that the Court should stay the review of the legality of the Plan amendments pending the disposition of the IBLA's review of the legality of the land exchange.

As previously noted, the Plan amendments changed the land tenure classifications of the lands to be swapped from "retention" to "disposal." This change in classification was necessary to facilitate the land exchange. However, at the same time, the ROD provided that there would be no change in land use unless the land exchange was approved. As a result, the land tenure classifications will have no independent impact on Plaintiff's use of the land if the land exchange is not approved by the IBLA, a fact which Plaintiffs do not

dispute. However, Plaintiffs do argue that their challenge to the Plan amendments is ripe for judicial review at this time.

■ Although they face no independent harm from the Plan amendments themselves, under Ninth Circuit precedent, Plaintiffs may be able to challenge the portion of the EIS pertaining to the Plan amendments under NEPA. In *Kern v. United States Bureau of Land Management*, 284 F.3d 1062 (9th Cir.2002), the Ninth Circuit held that the legality of an EIS under NEPA is ripe for review at the time the EIS is completed. "The rights conferred by NEPA are procedural rather than substantive, and plaintiffs allege a procedural rather than substantive injury. If there was an injury under NEPA, it occurred when the allegedly inadequate EIS was promulgated." *Id.* at 1071. Under *Kern,* Plaintiffs need not wait for specific policies to be promulgated under the revised Plan to sue for a procedural NEPA violation. *Id. See also Heartwood, Inc. v. United States Forest Serv.,* 230 F.3d 947 (7th Cir.2000) (holding that NEPA challenges to an EIS are ripe when forest management plan is approved, rather than when a specific project is authorized). The *Kern* holding follows the Supreme Court's observation in *Ohio Forestry Assoc. v. Sierra Club,* 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." The failure to legally perform an EIS under the requirements is thus a cognizable harm to plaintiffs that is immediately ripe for review.[2]

**2.** Plaintiffs have standing to challenge the EIS under NEPA because they have submitted unchallenged evidence that their members use and enjoy the public lands at issue. Pl's Mot. for Summ. Judg., Exh. 1–3. As *Kern* and *Heartwood* indicate, procedural injuries resulting from an illegally conducted EIS are cognizable. *See Kern,* 284 F.3d at 1070–1; *Heartwood,* 230 F.3d at 953. *See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (ex-

On the other hand, Plaintiffs may not challenge the Plan amendments substantively under the FLPMA until the BLM issues a policy under the changes, because the Plan amendments are not yet ripe for a FLPMA challenge. *See Ohio Forestry*, 523 U.S. at 733–34, 118 S.Ct. 1665 (holding that substantive challenges to legality of changes in a forest plan are not ripe); *Kern*, 284 F.3d at 1070 (indicating that *Ohio Forestry* bars substantive FLPMA challenges to Resource Management Plans absent further substantive injury, but distinguishing NEPA challenges to an EIS). Therefore, the FLPMA challenge to the Plan amendments is not yet ripe, and this portion of the case will be dismissed. Should the IBLA uphold the land exchange decision, Plaintiffs may seek leave to amend their Complaint to bring a FLPMA challenge to the Plan amendments.

In the meantime, Plaintiff's NEPA challenge to the EIS will also be stayed. There are a number of reasons to stay this portion of the case. First, both the EIS and Plaintiffs' objections are premised upon analyzing the environmental impact of the land exchange. Because the land exchange decision is not yet final, the Court should not address the issue prematurely, as an IBLA decision may render the issues moot. Second, the IBLA is currently reviewing the sufficiency of the same EIS as it applies to the land exchange. In fact, the IBLA is reviewing the same issues concerning mining rights, because the environmental impact determination implicates the land exchange as well. The IBLA should be afforded the opportunity to rule on issues properly before it. Finally, there is no particular urgency to consider the Plan amendment issue, because no change in land policy will be effectuated until the land exchange is approved. Further action on land use has

been effectively stayed pending the IBLA decision. Under these circumstances, the Court heeds the Ninth Circuit caution that a "stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Id.* at 864, 118 S.Ct. 1665. A ruling is not urgent, and the appeal with the IBLA has been filed for over a year. Rather than duplicate the IBLA's "parallel process," *see Leyva*, 593 F.2d at 864, the Court will stay its review of Plaintiffs' NEPA challenge to the Environmental Impact Statement.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment [Doc. # 22] is **DENIED**.

**IT IS FURTHER ORDERED** that Federal Defendants' Motion for Summary Judgment [Doc. # 38] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that AS-ARCO's Motion to Dismiss [Doc. # 24–1], Motion for Stay [Doc. # 24–2], and Motion for Summary Judgment [Doc. # 24–3] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Count I, to the extent it states a FLPMA claim to the Resource Management Plan amendments, is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED GRANTING STAY** of this cause of action pending a ruling on the land exchange by the Interior Board of Land Appeals.

**IT IS FURTHER ORDERED** that the parties are to notify the Court of a decision by the Interior Board of Land Ap-

plaining requirements for Article III stand-

ing).

peals within five days of the issuance of the decision.