WESTERN LAND EXCHANGE PRO-
JECT, Committee for Idaho's High
Desert, and Center for Biological Di-
versity, Plaintiffs,

v.

UNITED STATES BUREAU OF LAND
MANAGEMENT, Defendant.

No. CVN02–0343–DWH(RAM).

United States District Court,
D. Nevada.

March 19, 2004.

Heinrich Egghart, Heinrich Egghart, Attorney At Law, Reno, NV, Christopher Krupp, Western Land Exchange Project, Seattle, WA, for Plaintiffs.

Gregory Addington, U.S. Attorney's Office, Reno, NV, for Defendant.

### *ORDER*

HAGEN, District Judge.

Before the court are cross-motions for summary judgment. Plaintiffs filed a motion for summary judgment (# 20). Defendant opposed and filed a cross-motion for summary judgment (# 22/23). Plaintiffs replied and opposed defendant's cross-motion (# 28/29), and defendant replied (# 31).

### I. *Factual Background*

This case involves a proposal by the Bureau of Land Management ("BLM") to privatize 6,478 acres of desert land located in the extreme southeastern corner of Lincoln County, Nevada, just north of the city of Mesquite. The process leading up to disposal of this land has been lengthy and complex; the court will summarize only

the basic facts in this section, and will consider particular factual details as needed throughout this order.

The land at issue here is "undeveloped, open space land" described by BLM as "quiet and relatively undisturbed." (Administrative Record[1] ("AR") 1242.) BLM has managed the lands according to its "multiple-use" policy, under which historic uses have included "wildlife habitat, livestock grazing and casual, dispersed recreation." (AR 1253.) These lands provide "low density" habitat for the desert tortoise, a species protected under the federal Endangered Species Act ("ESA"). (AR 1249.) Four other species listed as either endangered or threatened under the ESA inhabit the waters and the floodplain of the Virgin River, which flows roughly from east to west about three miles south of the land area. (*See* AR 1250–1251.) Three "north to south trending washes," Town Wash, Abbott Wash, and Pulsipher Wash, drain southward across the project area into the Virgin River. (AR 1246.) On the other side of the Virgin River, about two miles south of the Lincoln County line, lies the rapidly expanding municipality of Mesquite. Over the past 20 years the population of Mesquite has grown from less than 1,000 to more than 15,000, a trend expected to continue. (*See* AR 1258.)

In June 1999, BLM released a Final Environmental Impact Statement (EIS) for an amendment to its Caliente Management Framework Plan addressing management of desert tortoise habitat. (AR 1401–1917.) BLM approved the amendment in September, 2000. In its record of decision, BLM identified certain areas of Lincoln County as Areas of Critical Environmental Concern ("ACECs") for desert tortoise conservation, and other areas as

suitable for privatization (or "disposal"). (*See generally* AR 1918–2010.) The lands at issue here were among those identified for disposal.

On October 13, 2000, Congress adopted the Lincoln County Land Act of 2000 ("LCLA"). Pub.L. 106–298, 114 Stat. 1046 (Oct. 13, 2000). Congress made various findings in LCLA concerning the high amount of Lincoln County land in federal ownership, the need for land onto which the growing city of Mesquite may expand, and the desire of local governments for an enhanced tax base and improved infrastructure resulting from residential and commercial development. *See* LCLA § 2(a). To this end, LCLA directed BLM to dispose of 4,817 acres of land within one year of the act's passage and an additional 8,683 acres of land within five years of enactment. LCLA § 4(b)(1). BLM was to do so in accordance with the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*, and "other applicable law," by way of a "competitive bidding process, at a minimum, for fair market value." LCLA § 4(a)(1). LCLA also required BLM to ensure that qualified bidders would comply with local zoning ordinances and master plans. LCLA § 4(d). A portion of the proceeds from the land sale were to be directed to the State of Nevada and Lincoln County for education funding and "support of schools," but the majority of the money was to be deposited in a "special account" administered by BLM. LCLA § 5(a). The act gave the Secretary of Interior discretion to use a portion of those funds for "development of a multispecies habitat conservation plan in the County" and for "reimbursement of costs incurred [by BLM], including the costs of . . . compliance with the National

---

1. BLM has lodged a copy of the administrative record of its decision with the court (# s 16, 17, 18, 24). The record occupies five volumes. Because the record is consecutively paginated, references hereafter shall denote only the page number and not the volume number (e.g., "AR 1235").

Environmental Policy Act." LCLA § 5(b)(1)(B), (C).

BLM began a series of "consultation and coordination meetings" with Lincoln County and City of Mesquite officials in November, 2000. BLM also initiated consultation with the United States Fish & Wildlife Service ("FWS") regarding the potential effects of the land disposal on endangered species. After several exchanges of information (*see, e.g.*, AR 329–330), FWS issued a biological opinion finding that the project would not jeopardize the existence of any listed species provided that certain "reasonable and prudent measures" were taken in mitigation. (*See generally* AR 425–482.) Among those measures was a recommendation that BLM require bidders to sign a Development Agreement ("DA") specifying that the lands would be covered under a Lincoln County Multiple Species Habitat Conservation Plan [2] ("LCMSHCP") designed to ensure that any impacts on the desert tortoise would be mitigated. (AR 463–464.) BLM also would be required to participate in developing the LCMSHCP. (AR 464.) Another measure required BLM to assist in formulating a "Hydrologic Monitoring and Mitigation Plan" ("HMMP") intended to detect whether additional development of groundwater resources to support residential and commercial expansion on the LCLA lands was having any adverse effect on surface flows in the Virgin River. (AR 464–466.) Neither of these plans existed at the time the FWS issued its biological opinion, although BLM had entered into a memorandum of agreement with other parties expressing an intent to develop the LCMSHCP and setting forth various goals and timelines. (*See* AR 310–328.)

BLM circulated a preliminary Environmental Assessment ("EA") for Phase I of disposal of the LCLA lands in August, 2001. (AR 1086–1219.) After eliciting public comment, BLM released its final EA (AR 1221–1362) and its Decision Record/Finding of No Significant Impact ("DR/FONSI") (AR 664–666) in September, 2001. For Phase I of the LCLA disposal, BLM proposed to sell three parcels at auction: Parcel A, consisting of 4,357 acres; Parcel B, at 2,009 acres; and Parcel C, at only 112 acres.[3] (AR 1234.) These parcels were scheduled to be offered at auction on October 12, 2001. (AR 682–683.)

On October 9, 2001, several organizations and individuals, including the plaintiffs in this action, filed appeals with the Interior Board of Land Appeals ("IBLA") challenging the adequacy of the EA and BLM's finding of no significant impact. (*See, e.g.*, AR 747–783.) The auction went ahead as planned on October 12, although bidders were informed (and required to sign a notice acknowledging) that the appeals "could affect the outcome of the

---

**2.** A non-federal entity may apply for a permit to "take" an endangered species—by either killing members of the species directly or destroying essential habitat—so long as the taking is "incidental" to some other lawful activity and the entity prepares a "conservation plan" showing how it will "minimize and mitigate" the effects on the species. *See* 16 U.S.C. § 1539(a)(1)(B), (a)(2)(A). Such plans generally are known as "habitat conservation plans," or HCPs. The LCMSHCP apparently would allow multiple private and governmental parties authority to "take" certain listed species across a wide area of southern Lin-

coln County. *See* Notice of Intent to Conduct Public Scoping and Prepare an Environmental Impact Statement Regarding the Lincoln County Multiple Species Habitat Conservation Plan, 66 Fed.Reg. 35451, 35451–52 (July 5, 2001). No further notice of any action regarding this plan appeared in the Federal Register as of the date of this order.

**3.** A fourth parcel, Parcel D, was found to be occupied by an existing golf course, and was sold separately by direct sale. That parcel is not at issue here.

sale." (AR 806.) According to a newspaper article included in the administrative record,[4] BLM received no bids on Parcels A or B, but did receive a bid on Parcel C. (*See* AR 813–813–814.) On January 18, 2002, the IBLA denied plaintiffs' request for a stay of BLM's action pending resolution of their appeals. *W. Land Exch. Project et al.,* No.2002–7 at *6 (I.B.L.A. Jan. 18, 2002): Less than a month later, the IBLA dismissed the appeals of the Western Land Exchange Project ("WLXP") and Center for Biological Diversity ("CBD") for lack of standing, but allowed the Committee for Idaho's High Desert ("CIHD") to go forward with the merits of its appeal. *W. Land Exch. Project et al.,* No.2002–7 at *2 (I.B.L.A. Feb. 14, 2002). That appeal is still pending.

Plaintiffs filed this action on June 26, 2002, alleging four counts: 1) failure to prepare an environmental impact statement (EIS); 2) failure to disclose and analyze environmental impacts adequately; 3) failure to analyze reasonable alternatives; and 4) failure to address mitigation measures adequately; all in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321–4335 and 40 C.F.R. Part 1500, and the Administrative Procedure Act (APA), 5 U.S.C. § 706. (Compl.(# 2) at ¶¶ 37–58.) They seek a declaratory judgment that BLM has violated NEPA and the APA, an injunction barring BLM from proceeding with the action until it has complied with the requirements of NEPA, and reasonable costs including attorneys' fees. (*Id.* at Part VI A.-D.)

## II. *Analysis*

### A. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1378 (9th Cir. 1998). If the parties file cross-motions for summary judgment, the court must consider each party's motion separately and determine whether that party is entitled to a judgment under Rule 56. In making these determinations, the court must evaluate the evidence offered in support of each cross-motion. *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir.2001). NEPA cases, which generally involve review of agency action based on a "complete and voluminous" administrative record, are "well suited to disposition on summary judgment." *Friends of Endangered Species, Inc. v. Jantzen,* 589 F.Supp. 113, 118 (N.D.Cal.1984), *aff'd,* 760 F.2d 976 (9th Cir.1985). "This is so because the goal of NEPA is simply to ensure 'a fully informed and well considered decision' on the part of the agency challenged. [The court's] role is not to substitute [its] discretion for that of the agency, but merely to check its compliance with the regulations of NEPA." *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)) (internal citation omitted).

---

4. Michael Weissenstein, *Lincoln County Land Auction Fizzles,* Las Vegas Review–Journal (Oct. 13, 2001), *at* http:// www.lvrj.com/lvrj_hom e/2001/Oct–13–Sat–2001/news/17216983.html.

## B. BLM's "Jurisdictional" Arguments

BLM has identified four reasons this court should not consider the merits of plaintiffs' motion for summary judgment. First, BLM challenges the plaintiffs' standing to bring this action. Second, BLM contends that NEPA does not apply to its decision in this case. Third, BLM argues that there is no pending action to enjoin. Fourth, BLM requests that the court stay this action pending a decision on CIHD's appeal before the IBLA.

### 1. Plaintiffs' Standing

BLM challenges the standing of all three plaintiffs in this action, primarily arguing that they have failed to provide sufficient evidence that they have suffered any injury. Plaintiffs disagree, pointing to a declaration filed by CIHD director Katie Fite in the appeal proceedings before the IBLA, which discusses her spiritual, recreational, and scientific use of lands that may be affected by the LCLA disposal and subsequent development.

■ Article III of the Constitution requires that a plaintiff meet three basic standing requirements. A plaintiff must show (1) that she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; 2) that the injury is caused by, or fairly traceable to, the challenged action; and 3) that it is likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir.2003) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). To defeat a defendant's summary judgment motion, a plaintiff must make these required showings by averring spe-

cific facts; conclusory allegations in a complaint or other pleading are insufficient to establish standing on summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### a. Injury in Fact

■ BLM argues that none of the plaintiffs in this case have shown an injury in fact. Plaintiffs, in turn, rely almost entirely on the declaration of CIHD's director in their standing arguments. A court need only find that one plaintiff has established standing to allow a case to proceed. *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1014–15 (9th Cir.2003). Therefore, this court need not examine whether WLXP and CBD have standing, provided that CIHD meets the test.

The Ninth Circuit recently clarified the showing necessary to demonstrate an injury in fact in cases alleging procedural harm under NEPA: "[plaintiffs] must allege (and on summary judgment adduce sufficient facts to show) that (1) the [defendant] violated certain procedural rules; (2) these rules protect [plaintiffs'] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Citizens for Better Forestry*, 341 F.3d at 969–70. Plaintiffs here have met the first element of the test by adducing sufficient facts from the administrative record to raise at least a genuine issue of material fact regarding BLM's compliance with NEPA.[5] BLM's challenge goes primarily to the second and third elements.

■ To show injury to a "concrete interest," a plaintiff must show a "geographical nexus" between herself and the

---

5. This element seems to overlap somewhat with the merits of the case at bar, which are considered in greater detail below.

location where the environmental impact will occur; in other words, she must show that she "will suffer harm by virtue of [her] geographic proximity to and use of areas that will be affected" by the challenged action. *Citizens for Better Forestry*, 341 F.3d at 971. "The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir.2000); *see also Friends of the Earth*, 528 U.S. at 183, 120 S.Ct. 693.

CIHD Conservation Director Katie Fite filed a declaration in support of her own and her organization's standing to appeal the BLM's decision before the IBLA.[6] This declaration is now part of the administrative record. (AR 894.) In her declaration, Ms. Fite states that she uses the "public lands of Lincoln County and surrounding areas that are affected by the [LCLA] disposal for recreational, scientific, spiritual and aesthetic purposes." (*Id.*) Specifically, Ms. Fite has "camped and hiked in Rainbow Canyon in Meadow Valley Wash, and [has] enjoyed viewing the cottonwood, willow and marshy riparian vegetation supported by the water course." (*Id.*) Ms.

Fite also has hiked, camped, "botanized," viewed wildlife, and taken photographs in the Delamar Mountains, specifically areas around Willow Creek and Indian Creek, where there are "exceedingly rare springs, seeps and streamcourses." (*Id.*) Furthermore, Ms. Fite has engaged in the same activities in the Kane Springs Valley, the Meadow Valley Mountains, and the Pahrangat wetlands, where she has also watched birds. (*Id.*) In concluding her declaration, she states that her "recreational, scientific, spiritual and esthetic uses and enjoyment of these lands will be harmed if its springs, seeps, wetlands, washes, streams and native flora and fauna are diminished by water depletion stemming from LCLA development." (*Id.*) In its reply, BLM submits the declaration of Jeffrey Weeks, an Assistant Field Manager for BLM's Ely, Nevada office. Mr. Weeks contends that he has reviewed Ms. Fite's declaration and concluded that all of the lands specifically mentioned by Ms. Fite are located more than 30 miles from Parcels C and D. (Weeks Decl., Ex. A to Def.'s Reply (# 31) at ¶¶ 5–6.) BLM thus argues that "no factual link has been established between Ms. Fite's claim of harm and the sale of the 112 acre or 15 acre parcels." (Def.'s Reply (# 31) at 7:15–16.)

---

6. BLM suggests that the court either ignore Ms. Fite's declaration or take a dim view of its evidentiary weight because it is not a sworn affidavit, and therefore does not comply with Fed. R. Civ. Proc. 56(e). The declaration, on its face, was not made under penalty of perjury, but it was signed and submitted to the IBLA as part of CIHD's administrative appeal. The Ninth Circuit has made clear that on summary judgment the focus is not on the form in which evidence is submitted, but rather on its contents. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *see also Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1352 n.

11 (9th Cir.1994) ("To survive a motion for summary judgment that challenges a claimant's standing, the claimant must demonstrate specific facts, through affidavit *or other competent evidence*, in support of his or her standing to bring the lawsuit.") (emphasis added). The court is confident that Ms. Fite's declaration could have been resubmitted as an affidavit for purposes of summary judgment. On the other hand, the declaration already was part of the administrative record, and it makes little sense to disregard it simply because the plaintiffs failed to reformat it as an affidavit and submit it with their moving papers before this court. Accordingly, the court will construe Ms. Fite's declaration as an affidavit, and will consider its contents for purposes of standing.

As discussed above, BLM is incorrect in asserting that "this lawsuit is not about the disposal 6,478 acres of public land [*sic*]," but concerns only "one 112 acre parcel and one 15 acre parcel [Parcels C and D] which were sold by BLM during the LCLA Phase I land sale." (Def.'s Reply (# 31) at 6:13–15.) Because BLM has stated on the record its intention to re-offer Parcels A and B for sale, and has already inflicted whatever procedural injury arose from the publication of an allegedly deficient EA, the entire disposal *is* still at issue. That said, plaintiffs' own exhibits make clear that the areas used by Ms. Fite are geographically distant from the lands to be disposed. (*See* Oversize Ex. in Support of Pl.'s Opp'n/Reply (# 30).) Meadow Valley Wash, at about 30 miles' distance from the LCLA lands, is the closest area visited by Ms. Fite; the Meadow Valley Mountains, Delamar Mountains, and Kane Springs Valley are even more distant. At first glance, this would appear to fail the Ninth Circuit's "geographical nexus" requirement. Plaintiffs' substantive allegations, however, concern not only the likely development of LCLA lands and resulting transformation of that property, but also the potential wide-ranging effects of that development on hydrology throughout the region. The record makes clear that groundwater in the Virgin Valley Hydrographic Area is already fully appropriated, and that future development on the LCLA lands will probably require a vast network of wells and pipelines, some of which could reach all the way to the Kane Springs area. (*See* AR 253, 450, 1272.) Moreover, the EA itself acknowledges that "potential future cumulative groundwater draw down effects on surface flows of the Virgin River cannot be estimated at this time, since the location, and the characteristics of the source aquifers are poorly understood." (AR 1276.) The record and the briefing in this case thus focus primarily on potential impacts to surface flows in the Virgin River rather than effects on the seeps, springs, riparian areas, and other surface water features observed and photographed by Ms. Fite. That said, it is precisely BLM's failure to prepare a full EIS in the face of this hydrological uncertainty that plaintiffs challenge.

Although the court was unable to locate a case on all fours with this one, prior precedent provides some guidance. Ms. Fite has certainly provided a more specific set of facts than the affidavits rejected by the Supreme Court in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In that case, two affiants stated that they used unspecified areas of public lands "in the vicinity" of other areas that may have been affected by mining operations, but did not specify that they used the actual affected lands. In a passage quoted by BLM here, the Supreme Court found that "Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." *Id.* at 889, 110 S.Ct. 3177; *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (denying standing to bring citizen suit under Endangered Species Act based on affidavits stating only vague intent to return to areas affected by action). Here, in contrast, Ms. Fite has identified specific areas and activities that reasonably could be harmed by the extensive water development that will be required to accommodate development plans for the LCLA lands. On the other hand, Ms. Fite's declaration does not allege that she actually used or sought to use the land that BLM seeks to dispose, which is a common way that plaintiffs establish standing in these kinds of

cases. *See, e.g., Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (granting standing to plaintiff organization whose affiant members refrained from recreating on river downstream from defendant's toxic discharge); *Cantrell v. City of Long Beach,* 241 F.3d 674 (9th Cir.2001) (granting standing to group of birdwatchers who observed bird habitat "over the property line" of naval base slated for closure and development). It seems reasonable to assume, however, that pumping water from the Kane Springs Hydrographic Area and building a pipeline network might well have an effect on recreational opportunities and surface water in that area, as well as on the more distant Virgin River. Thus there is a colorable, if somewhat attenuated, geographical nexus between the areas visited by Ms. Fite and BLM's action. NEPA therefore protects her "concrete interests" in those areas.

Plaintiffs also must show, however, that it is "reasonably probable" that the challenged action will threaten those interests. *See Citizens for Better Forestry,* 341 F.3d at 969–70. The crux of the problem is the attenuated connection between BLM's action and the harm she might suffer, which hinges on unknown hydrological connections between groundwater basins and surface water features in southeastern Lincoln County. That said, some kind of harm from the development of the LCLA lands is at least "reasonably probable." Ms. Fite in her declaration states a specific concern that water development on the LCLA lands will affect the very areas she has used in the past. She need not prove, however, that this actually will occur in order to establish standing. The Supreme Court has made clear that "[t]he relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff." *Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693. Nonetheless, there is evidence in the record showing

that Ms. Fite's stated fears may be well-founded. As discussed in greater detail below, BLM is seeking to dispose of the land with full knowledge of Lincoln County's plans for its development. The record is replete with references to concerns over water availability, and the final EA identifies both the Tule Desert and Kane Springs Valley hydrologic basins as potential sources. (AR 1272.) BLM estimates that nearly 60,000 acre-feet of water per year will be required to serve expected residential development and a planned power plant once the area is fully built out in 20 years. (*See* AR 1274.) According to a United States Geological Survey report incorporated into the administrative record, estimated annual recharge from precipitation in the Kane Springs Valley is only 2,600 acre-feet per year. (AR 956.) The same report shows that "a few hundred acre-feet a year of ground water is discharged by evapotranspiration from the springs in Coyote Spring and Kane Spring Valleys." (AR 959.) Thus there is an obvious risk of aquifer drawdown and depletion should Kane Springs Valley be selected as a water source, and a documented connection between groundwater and surface water features in that area.

Furthermore, the full extent of interconnectivity between these hydrologic basins, and the ultimate effect of extensive water development on surface water resources, remain unknown. The primary remedy sought by Ms. Fite's organization and the other plaintiffs in this case is an order directing BLM to study, among other things, this very issue. The Ninth Circuit's decision in *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346 (9th Cir.1994), is especially instructive here. In *Salmon River,* the court held that plaintiffs had standing to challenge the Forest Service's vegetation management plan, which involved application of herbicides, based on two affidavits: one from an indi-

vidual who recreated and gathered plants in affected national forests, and the other from a person with self-described chemical sensitivities. *See id.* at 1352–53. The court found that those affidavits supported the plaintiff organization's assertion of a procedural right to protect concrete interests, rather than a general procedural right alone. *Id.* at 1354–55 & n. 14 (citing *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130). Specifically, the court found that

> unfettered use of herbicides in Region 5 in the absence of NEPA compliance will cause harm to visitors' recreational use and enjoyment, if not to their health. Speculation that the application of herbicides might not occur is irrelevant. The asserted injury is that environmental consequences might be overlooked, as a result of deficiencies in the government's analysis under environmental statutes. Here, the threatened harm to [plaintiff's] members' health, recreational use, and enjoyment, in the absence of a vegetation management plan that complies with NEPA, is concrete, specific, imminent, caused by agency conduct in question, and redressable by a favorable ruling.

*Id.* at 1355 (internal quotations omitted). In the instant case, Ms. Fite has alleged a concrete interest in the recreational, scientific, and spiritual opportunities provided by the areas she has visited, including the Kane Springs Valley. She invokes her procedural rights under NEPA in order to protect that concrete interest. The procedural injury at issue here, therefore, is "that environmental consequences might be overlooked" unless the BLM prepares a full EIS. Although the question is close, the court is satisfied that Ms. Fite has shown injury in fact for purposes of Article III standing.

### b. Causation and Redressability

■■■ "Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir.2001) (citing *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130.) BLM's alleged failure to prepare an EIS fully analyzing hydrologic interconnectivity is the cause of the procedural injury described above. As to redressability, plaintiffs "need not show that [the preparation of an EIS] would result in the abandonment" of the agency's plans, nor "demonstrate that the ultimate outcome following proper procedures will benefit them." *Id.* A court order directing BLM to remedy the procedural injury allegedly suffered by plaintiffs would redress that injury. As such, the elements of Article III standing are satisfied, at least as to Ms. Fite.

### c. Statutory Standing Under the APA

■■■ To maintain this action under the APA, plaintiffs must demonstrate "(1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the plaintiff claims was violated." *Citizens for Better Forestry,* 341 F.3d at 976. BLM's publication of a final EA, along with its issuance of a DR/FONSI and its offering of the parcels for bid at auction, demonstrate that its action was final. The procedural injury identified above suffices to show that this action adversely affected Ms. Fite. Furthermore, the procedural injury alleged by Ms. Fite falls squarely within the zone of interests of NEPA, the purpose of which is to protect the environment. *See id.* Therefore, Ms. Fite has standing to bring this suit under the APA.

#### d. CIHD's Organizational Standing

CIHD, in turn, relies on Ms. Fite's individual standing as a member and Conservation Director of the organization in asserting its own standing. An organization can sue on behalf of its members as long as its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested require that members participate individually in the suit. *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019 (9th Cir.2003); *see also Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The court has already held that Ms. Fite, a member of CIHD, would have standing to sue in her own right. Furthermore, the interests at stake here are germane to CIHD's purpose as an environmental organization. *See Pub. Citizen*, 316 F.3d at 1019. Finally, because judicial review in a NEPA case is almost entirely confined to the existing administrative record, resolution of this claim does not require the individual participation of any CIHD member.

CIHD therefore has standing to bring this case, and the court need not inquire as to the standing of the other plaintiffs. *See id.* at 1014–15.

#### 2. NEPA Applicability Under the LCLA

BLM states that it is "questionable" whether NEPA applies to any LCLA land sale, arguing that LCLA rendered the land sales non-discretionary and imposed a one-year deadline for disposal of Phase I lands that would have made preparation of an EIS impossible. Plaintiffs disagree, contending that LCLA itself mandates NEPA compliance, and that BLM had adequate time to prepare an EIS.

Although agency actions under NEPA generally receive review under the highly deferential "arbitrary and capricious" standard, the Ninth Circuit applies a less deferential "reasonableness" standard to the threshold question of whether NEPA applies to an action. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir.2002) (citing *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir.1998)). Federal agencies must comply with NEPA "to the fullest extent possible" unless "a clear and unavoidable conflict in statutory authority exists." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787–88, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) (quoting 42 U.S.C. § 4332). Such an unavoidable conflict might arise where existing law applicable to an agency either expressly prohibits NEPA compliance or renders full compliance impossible. *Id.; see also* 40 C.F.R. § 1500.6 ("[E]ach agency of the federal government shall comply with [NEPA] unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.")

By its terms, LCLA seems to contemplate rather than expressly prohibit compliance with NEPA. In § 4(a)(1), Congress mandated that BLM dispose of the land in accordance with LCLA, the Federal Land Policy and Management Act, and "other applicable law." The act also provided that proceeds from the land sales be directed toward "reimbursement of costs incurred" by the BLM's Ely Field Office in preparing the sales, "including . . . compliance with the National Environmental Policy Act." LCLA § 5(b)(1)(C)(i). Thus LCLA expressly provided a way for the local BLM office to recover the costs of NEPA compliance "in preparing sales under this Act." *Id.* BLM cannot seriously contend now that LCLA expressly prohibits NEPA compliance. Indeed, LCLA seems to *mandate* NEPA compliance.

BLM nonetheless argues that two implied conflicts exist: first, disposal of the LCLA lands is non-discretionary and therefore exempt from NEPA, and second, the one-year timeframe for disposal creates an impossibility. In support of the first contention, BLM relies on a case in which the Ninth Circuit held that the procedural requirements of NEPA and the Endangered Species Act did not apply to a road right-of-way agreement adopted prior to enactment of either law, because BLM lacked any discretion under that agreement to modify the road design to protect endangered species. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1511–12 (9th Cir.1995) (holding that Congress did not intend those procedural requirements to apply to an agreement finalized before their enactment "where the federal agency currently lacks the discretion to influence the private activity for the benefit of the protected species"). The *Sierra Club* court saw "no benefit from NEPA compliance" where the BLM's authority to modify the road project was limited by the pre-NEPA agreement. *Id.* at 1512. Although BLM correctly points out that *Sierra Club* exempts truly non-discretionary agency actions from NEPA, the court declines to read *Sierra Club* so broadly as to subvert the plain meaning of LCLA. It is obvious that LCLA constrains BLM's authority to permanently withhold the subject lands from disposal or to modify the substantive terms of their sale, as the IBLA recognized in declining to issue a stay. *See W. Land Exch. Project et al.,* No.2002–7 at *5–6 (I.B.L.A. Jan. 18, 2002). LCLA's requirements, however, must be read as a whole, including its mandate that BLM comply with "applicable law" in disposing of the land, and its express provision for "reimbursement" of the costs of NEPA compliance. LCLA §§ 4(a)(1), 5(b)(1)(C)(i). As discussed previously, this mandate encompasses NEPA compliance. BLM has no more discretion to ignore the requirements of NEPA than it does to withhold the land from disposal.[7] If Congress had wanted to expedite the land disposal by exempting BLM from compliance with other applicable environmental laws, it would have done so in LCLA. The only reasonable reading of LCLA is that Congress chose to do exactly the opposite. In any event, plaintiffs do not seek any remedy that would require BLM to withhold the lands from disposal. They seek only compliance with NEPA, as contemplated by LCLA itself.

BLM's second argument, that preparation of an EIS would have been impossible within the one-year time frame for sale of the Phase I lands, is unsupported by anything in the record. As plaintiffs point out, the cases on which BLM relies in this argument all involved time frames of thirty days or less in which an EIS would have to be completed. *See Flint Ridge,* 426 U.S. at 788–89, 96 S.Ct. 2430 (thirty days); *Westlands Water Dist. v. U.S.,* 43 F.3d 457, 460–61 (9th Cir.1994) (no time frame allotted for NEPA analysis because water delivery had to be completed "immediately upon enactment" of statute); *Merrell v. Thomas,* 807 F.2d 776, 778 (9th Cir.1986) (thirty days). BLM cites to nothing in the record in support of its conclusory assertion that production of an EIS "would not have been possible within the one year

---

7. BLM's reliance on *Sierra Club* is also somewhat puzzling in light of the agency's decision to engage in formal consultation with FWS over the possible effects of land disposal on threatened and endangered species. The bulk of the Ninth Circuit's opinion in *Sierra Club* is devoted to concluding that the interagency consultation provisions of the Endangered Species Act apply only to discretionary agency actions. *See Sierra Club,* 65 F.3d at 1508–1512. If BLM had viewed its actions as entirely non-discretionary within the meaning of *Sierra Club,* it never would have initiated consultation.

time frame imposed on BLM." (Def.'s Opp'n/Cross–Mot. (# 22/23) at 17:6–7.) Without any record evidence to support the agency's contentions, this court cannot conclude that it would have been reasonable for BLM to decide that NEPA did not apply. Indeed, given that the record is replete with evidence of BLM's attempts to comply with NEPA, and contains nothing demonstrating that BLM ever thought NEPA was inapplicable, BLM's argument here strikes the court as a *post hoc* justification for its decision not to prepare an EIS. This decision, however, only was reached after BLM prepared two versions of the EA—in other words, until after BLM had already complied with NEPA to the extent it determined was necessary. Again, BLM cannot now claim that it would have been reasonable to conclude that NEPA did not apply to the land sale. The plain meaning of LCLA, and BLM's own actions throughout this process, dictate that the only reasonable conclusion is to the contrary.

### 3. BLM's Argument that there is No Pending Action

When BLM offered the Phase I LCLA lands for sale on October 12, 2001, it received bids on only Parcel C (the 112–acre parcel at the extreme southeastern corner of Lincoln County). No bids were received on the 6,366 acres comprising Parcels A and B. BLM now argues that there is no current proposal to sell either Parcel A or B, and thus no pending federal action for NEPA purposes. Furthermore, BLM contends that issuing the patent for Parcel C is simply a ministerial act requiring no decision-making, and therefore is not a federal action either. BLM also asserts that enjoining the sale of Parcel C "would necessarily involve enjoining parties who are not before this court" because the purchaser already has paid for the land. (Def.'s Opp'n/Cross–Mot. (# 22/23) at 11:8.) Plaintiffs respond that BLM clearly

made a proposal in offering all of the Phase I lands for sale, and that the NEPA claim became ripe at that time. They also insist that the purchasers were "well aware that the sale ... was contingent upon future administrative appeals and litigation" (Pl.'s Opp'n/Reply (# 28/29) at 4:3–4), as evidenced by the LCLA Bidder Notice and Consent letter that potential bidders were required to sign. (*See* AR 806.)

■■■ BLM's arguments as to Parcels A and B must fail. BLM relies on *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), in which the Supreme Court refused to require that environmental impact statements be prepared for three large regional studies concerning possible development of coal resources in the Northern Great Plains region. The Court held that none of these studies contemplated specific actions or proposals at a regional level, and that the court of appeal below had erred in developing its own factors, apart from those in the statute, concerning when an environmental statement was necessary. *See id.* at 402, 406, 96 S.Ct. 2718. In the instant case, however, there was a specific proposal at the local level: to dispose of 6,478 acres of land, pursuant to the terms of LCLA. Although BLM now disputes that NEPA ever applied to this proposal, the record is quite clear that BLM sought to comply with NEPA by preparing an EA and issuing the DR/FONSI. Plaintiffs' alleged procedural injury under NEPA occurred when BLM issued those documents. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070–71 (9th Cir.2002) ("If there was an injury under NEPA, it occurred when the allegedly inadequate EIS was promulgated."); *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (noting that a plaintiff "injured by a failure to comply with the NEPA procedure may

complain of that failure at the time the failure takes place, for the claim can never get riper").

The fact that BLM did not receive bids on those parcels does not necessarily obviate plaintiffs' alleged procedural injury. This is clear from the internal contradictions in BLM's own argument. BLM insists throughout its briefing that LCLA simply mandates disposal of the land, leaving BLM with absolutely no discretion to do anything else. (*See, e.g.,* Def.'s Opp'n/Cross–Mot. (# 22/23) at 15:26–16:25 (arguing that NEPA does not apply to non-discretionary disposals of land).) Here, however, BLM seems to claim that the land will not be sold because no bids were received. BLM cannot have it both ways. Indeed, a newspaper article included in the administrative record makes clear that BLM intended to keep offering the property after failing to receive bids at the first auction. (AR 814.) Furthermore, there is some circularity to BLM's suggestion that the property did not sell because of the uncertainty created by plaintiffs' administrative appeals. Once those issues are resolved, either through this litigation or by the IBLA, BLM presumably will attempt to sell the land again pursuant to the intent of Congress in LCLA. Thus plaintiffs have a ripe and justiciable cause of action concerning BLM's alleged failure to comply with NEPA in its land sale proposal.

BLM's argument regarding Parcel C also fails, although it does present a somewhat closer question. BLM contends that the only action remaining with respect to Parcel C—the issuance of a patent to the high bidder—is non-discretionary. BLM again relies on *Sierra Club v. Babbitt,* 65 F.3d 1502 (9th Cir.1995), which confirmed that non-discretionary agency actions are not subject to NEPA. BLM confuses the issue somewhat, however, by proceeding as if the issuance of the patent itself is the proposed action, rather than the initial proposal to dispose of the Phase I lands together. Once again, it bears mention that NEPA provides a procedural remedy for a procedural injury, and that plaintiffs' alleged injury occurred when the EA was published and the DR/FONSI adopted. BLM's decision to solicit bids did not cure or moot that injury. Furthermore, the successful bidder on Parcel C was well aware that the outcome of plaintiffs' appeals might affect whether its bid was accepted, and BLM was well aware in issuing notice of this fact to all bidders that it might not be able to accept their offers. (*See* AR 806.) Title has not yet passed, and the high bidder has provided only a 20 percent deposit (AR 837), fully recognizing that its deposit could be forfeited. (*See* AR 710, 808 (letters from potential bidder objecting to non-refundable deposit requirement).) It is clear that Congress directed BLM to dispose of the LCLA lands, and it is equally clear that Congress wanted BLM to do so in accordance with "applicable law," including NEPA. Plaintiffs' NEPA claims pertaining to Parcel C are still ripe, and this court may enter an order directing BLM to comply with NEPA in the sale of Parcel C.

### 4. BLM's Request for a Stay

BLM argues in its reply that this court should stay the instant proceedings pending a resolution of CIHD's appeal currently pending before the IBLA. (*See* Def.'s Reply (# 31) at 7:17–9:12.) As a threshold matter, the court notes that this argument could and should have been raised in BLM's cross-motion for summary judgment, and that plaintiffs thus have not had a fair opportunity to brief the issue. As BLM is surely aware, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(c). Under these circumstances, the court hesitates even to entertain such a request. Because it involves issues of judicial economy, however, the court will briefly address BLM's argument.

BLM relies on a case from the District of Arizona in which the court stayed an action challenging a land exchange decision pending the IBLA's resolution of the plaintiff's administrative appeal. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior,* 255 F.Supp.2d 1030 (D.Ariz.2003). In that case, the plaintiff filed an administrative appeal and request for a stay with the IBLA, which failed to rule on the request within 45 days of the last date on which an appeal could be filed. *Id.* at 1033. Once that 45-day period ran, the BLM's decision became final and judicially reviewable. *Id.* at 1033-34. Plaintiffs filed a lawsuit in district court shortly thereafter. About six weeks after the lawsuit was filed, the IBLA granted the plaintiff's request for a stay. *See id.* at 1033. The court held that IBLA's surprise action did not make the BLM's action "non-final" or unreviewable, *id.* at 1035-36, but nonetheless stayed the action pending the IBLA's final ruling. *Id.* at 1036. In so doing, the court relied on "policy concerns against conducting parallel administrative and judicial proceedings," as well as the doctrine of primary jurisdiction. *Id.* at 1036-37. Specifically, the court wished to avoid issuing a ruling that would conflict with the ruling of the IBLA, and determined that the IBLA's expertise in reviewing the technicalities of mining and millsite claims would inform the court's final judgment. *Id.* at 1037. The court summarized its reasoning as follows:

> Because the land exchange decision is not yet final, the Court should not address the issue prematurely, as an IBLA

decision may render the issues moot. Second, the IBLA is currently reviewing the sufficiency of the same EIS as it applies to the land exchange. In fact, the IBLA is reviewing the same issues concerning mining rights, because the environmental impact determination implicates the land exchange as well. The IBLA should be afforded the opportunity to rule on issues properly before it. Finally, there is no particular urgency to consider the Plan amendment issue, because no change in land policy will be effectuated until the land exchange is approved. Further action on land use has been effectively stayed pending the IBLA decision.

*Id.* at 1039. In other words, where the IBLA was considering the same issues raised in the district court, and the stay ensured that no change in the status quo would occur, the court found it proper to stay the litigation and wait for a final IBLA decision.

■ The facts of the instant case are somewhat different. The IBLA has rejected plaintiffs' petitions for a stay pending further review. *W. Land Exch. Project et al.,* No.2002–7 at *6 (I.B.L.A. Jan. 18, 2002). Thus there is a different level of urgency to these proceedings in federal court, because no administrative order currently protects the status quo. Furthermore, it has been more than two years since the IBLA's last ruling in the appeal, in which it denied BLM's motion to dismiss CIHD's appeal for lack of standing, apparently clearing the way for a ruling on the merits. *W. Land Exch. Project et al.,* No.2002–7 at *2 (I.B.L.A. Feb. 14, 2002). The Ninth Circuit has cautioned that "[a] stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Leyva v. Certified Grocers*

of Cal., Ltd., 593 F.2d 857, 864 (9th Cir. 1979). Given the unexplained and substantial delay in the appeal proceeding thus far, this court finds no reason to believe that the IBLA will rule on the appeal within a reasonable time in relation to the urgency of the claims. Unlike the situation addressed in *Center for Biological Diversity,* no administrative stay currently protects the status quo here, and BLM appears free to alter it. Finally, the tardiness of BLM's request renders its invocation of the principles of judicial economy somewhat disingenuous. The IBLA appeal has been pending throughout this action, from the filing of the complaint on June 26, 2002, to the present day. BLM answered plaintiffs' complaint, prepared and lodged an administrative record with this court, filed a cross-motion for summary judgment, opposed plaintiffs' motion for summary judgment, and filed its final reply before ever raising this argument. If BLM had any genuine concern for this court's resources (and the resources of the plaintiffs), it would have asked for a stay of proceedings long ago. For all of the foregoing reasons, BLM's tardy request for a stay is denied.

## C. Plaintiffs' Substantive NEPA Arguments

Plaintiffs present two related NEPA challenges, first to BLM's decision not to prepare an EIS, and second to the sufficiency of the EA.

### 1. BLM's Decision Not to Prepare an EIS

#### a. Standard of Review and Applicable Law

An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is "arbitrary and capricious." *Kern v. U.S. Bureau of Land Mgmt.,* 284 F.3d 1062,

1070 (9th Cir.2002) (citing *Marsh v. Ore. Natural Res. Council,* 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)); *see also* 5 U.S.C. § 706(2)(A) (court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Specifically, the court must determine whether the agency took a "hard look" at the environmental consequences of the proposed action. *Anderson v. Evans,* 350 F.3d 815, 829 (9th Cir.2003). "This includes considering all foreseeable direct and indirect impacts." *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir.2002). Although the court must defer to an agency conclusion that is "fully informed and well-considered," it need not "rubber stamp a clear error of judgment." *Anderson,* 350 F.3d at 829 (internal quotation omitted).

NEPA requires federal agencies, when undertaking "major Federal actions significantly affecting the quality of the human environment," to prepare an EIS addressing the environmental impacts of the action and alternatives to the action. 42 U.S.C. § 4332(2)(C); *Anderson,* 350 F.3d at 829–30. The goal of NEPA is two-fold: (1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience. *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1063 (9th Cir.2002). Under NEPA regulations, "major Federal actions" include "new and continuing activities, including projects ... approved by federal agencies," 40 C.F.R. § 1508.18(a), as well as "specific projects, such as construction or management activities located in a defined geographic area." 40 C.F.R. § 1508.18(b)(4). The regulations also define "significantly" as involving "considerations of both context and intensity." 40

C.F.R. § 1508.27. In terms of context, "[s]ignificance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend on the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27(a). Both the short-term and the long-term effects of an action are relevant to context. *Id.* With respect to intensity, the regulations set forth a number of factors to be considered in evaluating "the severity of the impact," several of which are directly relevant here:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b). The regulations also prohibit "segmentation" of environmental analysis by mandating that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

 An agency may prepare a less formal EA in order to determine whether or not an action will "significantly affect" the environment. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9. If no significant impact will occur, the agency may issue a finding of no significant impact ("FONSI") rather than prepare an EIS. 40 C.F.R. § 1508.13. A plaintiff seeking to show that an agency should have prepared an EIS instead of a FONSI "need not demonstrate that significant effects *will* occur," but rather must show only that "there are *substantial questions* whether a project may have a significant effect of the environment." *Anderson*, 350 F.3d at 831 (internal quotations omitted).

### b. Plaintiffs' Argument that an EIS was Necessary

Plaintiffs make three broad arguments in support of their claim that BLM should

have prepared an EIS for the disposal of Phase I LCLA lands. First, plaintiffs contend that the project will have possibly significant impacts on threatened and endangered species in the area, including those dependent on surface flows in the Virgin River, and that there is substantial uncertainty about the risks posed. Second, plaintiffs argue that the cumulative impacts of the project may be significant. Third, according to plaintiffs, BLM has improperly "segmented" analysis of the project's impacts by deferring consideration of possible impacts from construction and operation of the water supply system for the planned development on LCLA lands. BLM counters that it is not the risks of its action, but rather whether the LCLA lands will be developed at all, that is unknown and uncertain. The mere transfer of title to the LCLA lands, in BLM's view, will not have any environmental effects at all. In any event, BLM argues that an EIS is not necessary because the EA properly considered cumulative impacts and connected actions, complied with local land use plans, considered reasonable alternatives, and incorporated mitigation measures that will render the project's impacts less than significant.

Although all of these arguments are interrelated, the court—for clarity of analysis—will separate them into several categories and consider each in turn.

### i. Segmentation of Analysis

BLM's primary argument in opposition to plaintiffs' summary judgment motion is that the transfer of title to the LCLA lands, in and of itself, works no change in the environmental status quo and therefore cannot have a significant impact. BLM thus reasons that any environmental analysis it chose to do in its EA already went above and beyond the call of NEPA, and that any further analysis of environmental impacts may be deferred until specific development and water delivery plans

are proposed. BLM also contends that the LCLA land disposal is not "connected" to any future development because the privatization of the land has an "independent utility." Because these arguments bear heavily on the parties' remaining contentions, the court will consider them first.

■ BLM relies on *National Wildlife Federation v. Espy*, 45 F.3d 1337 (9th Cir.1995), for the proposition that transfer of title does not implicate NEPA. In that case, however, it was clear that land use would not change after title was transferred; the new owners of the property used it for grazing cattle, just as the prior owners had. *See id.* at 1343. Here, it is abundantly clear from the record that use of the LCLA lands is highly likely to change following privatization. LCLA itself sets forth Congress's finding that Lincoln County citizens "would benefit through enhanced county services and schools from the increased private property tax base due to commercial and residential development." LCLA § 2(a)(4). LCLA also required BLM to ensure that qualified bidders intended to comply with "any master plan for the area developed and approved by [Lincoln] County and [the] City [of Mesquite]." LCLA § 4(d)(2). These master plans do not appear to be in the record, but it is clear that BLM relied upon assumptions in existing plans in complying with NEPA and other environmental laws. Early in the planning process, BLM told FWS that "[a] development scenario of 3.3 dwellings per gross acre was used in the City of Mesquite's *Long Range Comprehensive Master Plan* dated July 5, 1995," and that "Lincoln County has decided to use the 3.3 dwellings per gross acre as an estimate for the LCLA lands." (AR 329.) The same letter identifies the number of dwellings expected to be built on the LCLA lands at five-year intervals over a 20-year period, as

well as the amount of water required to service those homes at each stage of development. (*Id.*)

Moreover, BLM contemplated ensuring compliance with local land use plans and goals by requiring high bidders to sign "Development Agreements" with the County and the City of Mesquite. (AR 81–82.) The Notice of Realty Action transmitted by BLM for publication in the Federal Register specified that a Development Agreement would be required of all high bidders "to assure organized and planned development," and that a related Reconveyance Agreement would require "at least 23% of the total acreage within the parcel to be transferred to Lincoln County for public purposes" such as "roads, school sites, and other public facilities." (AR 335.) BLM signed a memorandum of understanding with the County and the City in which it agreed that the property should be "marketed and sold consistent with the conclusions and recommendations of the Long–Range Comprehensive Master Plan for the City of Mesquite," and that BLM would not transfer title to a successful high bidder until the bidder signed a Development Agreement. (AR 419.) The appraisal of the property assumed that it would be developed as a planned residential community, citing these required agreements. (*See* AR 688.) The EA explicitly assumed that development of the land would proceed "consistent with" the City of Mesquite's Long Range Comprehensive Master Plan, and that "[a] majority of the land within the three Phase I parcels would be developed as planned developments that integrate residential, commercial, and recreational uses." (AR 1240.) BLM did not even consider the alternative of selling the land in smaller parcels because this would not be consistent with the County's desire "for a planned residential community developed on LCLA lands" and would not "facilitate the financing, construction, and mainte-

nance of needed water, wastewater, and public infrastructure." (AR 1239.) Finally, the Development Agreements for all three Phase I parcels, published as appendices to the EA, all contain the following language: "The COUNTY and BLM have agreed that the PROPERTY should be marketed and sold consistent with the desires of the COUNTY which include development of the PROPERTY under a single master plan, incorporating mixed-uses [*sic*], including residential, commercial, industrial, and public uses, known as a Master Planned Community." (AR 1292, 1313, 1334.) It is highly likely, if not reasonably certain, that BLM fully expected land use on the LCLA lands to change as a result of privatization. The Ninth Circuit's analysis in *National Wildlife Federation* is inapposite here.

Furthermore, even though development may not be a direct effect of privatization, NEPA clearly requires analysis of "*all* foreseeable direct *and indirect* impacts." *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir.2002) (emphasis added). Under NEPA regulations, indirect effects are those that are

> caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b). The impacts here are "caused by the action," in the most straightforward sense, insofar as they would not occur but for privatization. Furthermore, the impacts were not just "reasonably foreseeable," but actually intended. Aggressive development of the land was the assumed purpose of the en-

tire disposal project. In its DR/FONSI, BLM states plainly (under the heading "Rationale") that its action "is intended to accommodate orderly expansion of the City of Mesquite to the north." (AR 664.) In this light, the impacts from development were not so "highly speculative or indefinite" as to render analysis unnecessary. *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998).

BLM similarly contends that privatization has an "independent utility," primarily because it will immediately place the property on Lincoln County's "private property tax rolls, whether developed or not." (Def.'s Opp'n/Cross–Mot. (# 22/23) at 23:18.) The Ninth Circuit has held that "[w]here each of two projects would have taken place with or without the other, each has 'independent utility' and the two are not considered connected actions' for NEPA purposes". *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir.2002). BLM's reliance on this case, and the concept of "independent utility," is misplaced. Privatization of the LCLA lands is a necessary precondition to development for residential, commercial, and other mixed-use purposes. There is no way that the two projects "would have taken place with or without the other." *Id.* There is ample evidence in the record that privatization and development are "related to each other closely enough to be, in effect, a single course of action" requiring analysis in the same NEPA document. 40 C.F.R. § 1502.4(a). Even if the projects are not "connected" within the meaning of NEPA, see 40 C.F.R. § 1508.25(a)(1)(i)-(iii), the indirect effects from development were clearly foreseen, and their analysis should not have been deferred until some other document was produced at some later date.

Finally, although the court already addressed BLM's contention that disposal of the LCLA lands is non-discretionary and therefore not subject to NEPA, it bears reiteration that an EIS considering the full environmental impacts of the action is not inconsistent with (or irrelevant in light of) LCLA. While BLM may not have discretion to withhold the lands permanently, it has a parallel duty to comply with "applicable law," including NEPA, in their disposal. A NEPA document in this instance should inform local officials and the public of the potential environmental impacts of the action mandated by Congress, and may well provide important guidance for future development with respect to potential effects and necessary mitigation measures. BLM's responsibilities under LCLA and NEPA are not inconsistent, but rather mutually reinforcing, and BLM has no more discretion to ignore the latter than it does the former.

### ii. Potential Impacts on the Desert Tortoise

The desert tortoise, a species listed as threatened under the ESA, is "known to occur on the LCLA lands at relatively low densities." (AR 1247.) FWS has designated 1.2 million acres of critical habitat in Nevada for the desert tortoise, and has adopted a final recovery plan recommending establishment of Desert Wildlife Management Areas or Areas of Critical Environmental Concern ("ACECs") in which human activities on federal lands would be restricted to protect the species. (AR 445.) In September 2000, BLM adopted an amendment to its Caliente Management Framework Plan, in which it designated three ACECs in Lincoln County, two of which are adjacent to the LCLA lands. (*See generally* AR 1918–2010.) This amendment also identified various parcels for disposal, including the LCLA lands. (AR 2003–2008.)

A map in the EA shows that part of Parcel A directly borders the Beaver Dam

Slope ACEC, and that all of the parcels are located within about three miles of either the Beaver Dam Slope or Mormon Mesa ACECs. (AR 1248.) The FWS's biological opinion makes clear that tortoises may "make forays of more than 7 mi [*sic*] at a time" (AR 443), showing that tortoises within the ACECs easily might find their way onto the LCLA lands. The EA acknowledges that both direct and indirect effects on the tortoise may result from development of the LCLA lands. Direct effects "could include, crushing and/or removal of vegetation, crushing of burrows, compaction of soil, and direct taking of a tortoise." (AR 1249.) Indirect effects both inside and outside the ACECs might include "increased recreational use, dumping, collection of tortoises, introduction of non-native species, and increased fire risk." (*Id.*)

One of the factors an agency must consider in determining the significance of a project's environmental impacts is "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act." 40 C.F.R. § 1508.27(b)(9). BLM points out that the LCLA lands were identified for disposal in the Caliente Management Framework Plan Amendment, and that future development activities on the lands will require permits under the ESA. BLM concludes that "there is no evidence ... that privatizing the lands will result in significant impacts to the desert tortoise, nor that any future development cannot occur in concert with other legal protections for threatened and endangered species, preventing any future adverse impacts." (Def.'s Opp'n/Cross–Mot. (# 22/23) at 20:25–28.) The EA also lists a number of other mitigation measures that "could be employed," including a "road/ fence/trail system" around the perimeter of the LCLA lands, public education, and periodic law enforcement patrols, and

notes that "[f]urther definition of these measures and funding sources will be included in the Lincoln County Multispecies Habitat Conservation Plan and ACEC management plans that will be prepared." (AR 1249–1250.) In the DR/FONSI, BLM concluded that impacts to endangered species would not be significant because the LCLA lands would be covered by the LCMSHCP and BLM would commit to developing the ACEC management plans. (AR 665.)

■■■■ In other words, BLM acknowledged that direct and indirect impacts to a federally listed species could occur as a result of the project, and relied entirely upon future permits and mitigation plans in determining that these impacts would not be significant. BLM correctly observes that its "decision to forego issuing an EIS may be justified by the presence of mitigating measures." *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1121 (9th Cir.2000). Those measures, if "significant," need not "completely compensate" for a project's environmental impacts in order to justify the agency's decision not to prepare an EIS. *Friends of Payette v. Horseshoe Bend Hydroelectric,* 988 F.2d 989, 993 (9th Cir. 1993). The mitigation measures must be "developed to a reasonable degree," however, and neither a "perfunctory description" nor a "mere listing" of measures, in the absence of "supporting analytical data," is sufficient to sustain a finding of no significant impact. *Nat'l Parks and Conservation Ass'n v. Babbitt,* 241 F.3d 722, 734 (9th Cir.2001). Specifically, a court must evaluate whether the proposed measures "constitute an adequate buffer against the negative impacts that may result from the authorized activity," and whether "the mitigation measures will render such impacts so minor as to not warrant an EIS." *Id.*

■ BLM's mitigation measures fail to meet this standard. The EA contains no assurance that any of the mitigation measures that "could be employed" actually will be, and defers "further definition" of the measures and development of funding mechanisms until some unspecified point in the future, when the LCMSHCP and the ACEC Management Plans "will be prepared." The record contains no "supporting analytical data," *National Parks*, 241 F.3d at 734, concerning mitigation measures that purportedly will be incorporated into these plans. At best, the record contains an "assistance agreement" between BLM, Lincoln County, and The Nature Conservancy, setting out the parties' responsibilities in facilitating preparation of the LCMSHCP. (AR 310–328.) This agreement contains no information about specific environmental impacts or potential measures that would minimize and mitigate the effects of activities to be covered by the LCMSHCP on endangered species. *See* 16 U.S.C. § 1539(a)(1)(B), (a)(2). Courts upholding an agency's reliance on mitigation measures in deciding to forego an EIS have noted at least some details of the proposed plans and made some findings as to their effectiveness, even where those plans were not worked out to the last detail at the moment of decision. *See, e.g., Wetlands Action Network*, 222 F.3d at 1121–22 (approving issuance of permit to fill wetland area based on creation of "51 acre freshwater system" and "special conditions included in the permit" that allowed the agency to "determine the precise nature of many of the mitigation measures at the time that it made the permitting decision"); *Friends of Payette*, 988 F.2d at 993 (finding plans to reduce loss of riparian habitat by 6.3 acres and create 66.64 acres of new wetlands sufficient to justify FONSI, even though plans would not completely compensate for project's effects). Where an agency has not even studied the potential effectiveness of mitigation measures, and there is a "paucity of analytic data" to support its conclusions, it may not rely on those measures in finding no significant impact. *National Parks*, 241 F.3d at 734. An agency may not "act first and study later." *Id.* BLM's decision to issue a FONSI in reliance on mitigation plans that had not even been defined, much less analyzed, was arbitrary and capricious. The EA provides only a "mere listing" of measures that "could be employed," and a "perfunctory description" of the LCMSHCP and ACEC Management Plans that supposedly will give these measures "further definition." This cannot justify a FONSI.

The EA itself therefore raises a substantial question as to whether the project's impacts on the desert tortoise will be significant. As such, an EIS must be prepared.

### iii. Potential Impacts on Virgin River Flows and Dependent Species

The Virgin River and its 100–year floodplain are located about three miles south of the LCLA sale lands. (AR 1250.) The river and its riparian areas provide habitat for four endangered or threatened species: two fish, the Virgin River chub and the woundfin minnow, and two birds, the southwestern willow flycatcher and the Yuma clapper rail. (AR 1250–51.) The EA acknowledges that development of the LCLA lands could result in stormwater discharges that might affect this habitat by modifying channel shape, changing river flow volumes and duration, and increasing suspended sediment loading. (AR 1250.) To avoid these effects, "a comprehensive drainage study and plan must be completed for the LCLA lands to properly detain and route storm water." (*Id.*) The EA concludes that "riparian and wetland habitats within the Virgin River floodplain

would not be reduced, or structurally modified by large flood events originating within LCLA sale land watersheds because of the implementation of drainage and storm water plans." (AR 1251.)

Furthermore, there is considerable uncertainty regarding the possible effects of groundwater pumping on surface flows in the Virgin River. Acquisition of water resources in areas outside the Virgin Valley basin, which is already fully appropriated, would be necessary to support development on the LCLA lands. (AR 450, 1272.) At projected build-out levels, in accordance with the local land use master plans that guided BLM's analysis, the LCLA lands would require about 21,400 acre-feet of water per year. (AR 329, 1240.) The EA mentions the Tule Desert and Kane Springs Valley basins as possible sources. (AR 1272.) The Tule Desert basin has an estimated perennial yield[8] of about 2,000 acre-feet per year. (AR 450.) The record is not clear as to what the perennial yield of the Kane Springs Valley basin might be, but the estimated annual recharge from precipitation in the area is only 2,600 acre-feet. (AR 956.) According to the FWS in its biological opinion,

> [c]oncern exists regarding the impacts of ground water withdrawal from surrounding basins on surface water flows in the Virgin River. The degree of ground water connectivity between the Tule Desert and Virgin River Valley Hydrographic Areas is uncertain, and the potential effects of pumping ground water from the Tule Desert and Virgin Valley basins on surface flows in the Virgin River is unknown and needs further study.

(AR 450.) FWS found that "ground water withdrawal that contributes to any additional depletion of Virgin River surface water flows may adversely affect all listed species that occur in this river system." (AR 458.)

In response to this concern, FWS proposed, and BLM agreed to participate in, development of a Hydrology Monitoring and Mitigation Plan ("HMMP") for the Lower Virgin River Valley. (AR 466–467, 1250–1251.) This plan is intended "to provide early warning and facilitate implementation of offsetting measures for impacts to surface flows from groundwater pumping." (AR 466.) The biological opinion sets forth a timeline for development of the HMMP that requires BLM to sign a memorandum of agreement[9] regarding plan development before patenting any of the Phase I lands. (*Id.*) The signatories to this agreement are supposed to cooperate in asking other interested parties for their participation within nine months of the sale, developing a schedule and planning process for development of the plan within 12 months of sale, and identifying sources of funding for the plan within 12 months of patenting the land. (*Id.*) At no point, however, does the biological opinion, or any other document that this court could locate in the record, provide any details concerning the monitoring strategies or mitigation measures that might flow from such a plan. Nor does any document in the record reveal how such a plan might affect the water rights of various parties—including, presumably, the developers of the LCLA lands—under Nevada law.

---

8. "Perennial yield" is the amount of water that can be withdrawn economically from a groundwater basin without causing permanent depletion or deterioration of water quality. (*See* AR 959.)

9. BLM claims in its opposition that this memorandum was signed in May, 2002. (Def.'s Opp'n/Cross-Mot. (# 22/23) at 27:23–25.) The document does not appear in the record, which is understandable given that it was created several months after BLM rendered its decision.

Plaintiffs are correct that this is a situation in which "the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(5). One of these risks, as the FWS determined in its biological opinion, is that groundwater pumping will result in adverse effects on four federally listed species. *See* 40 C.F.R. § 1508.27(9). Thus plaintiffs have raised a "substantial question" as to the existence of significant environmental impacts. BLM concluded in the DR/FONSI, however, that "[t]o the extent that the Proposed Action involves unique or unknown risks, mitigation measures have been developed." (AR 665.) Insofar as BLM again attempts to justify its finding of no significant impact by relying on a monitoring and mitigation plan that exists only in principle, this conclusion is unsupported. Although this court does not doubt BLM's sincerity in signing a memorandum of agreement to develop the plan, it cannot evaluate whether that plan will even detect groundwater depletion, much less be effective in mitigating impacts to surface flows, in the absence of any "supporting analytical data" whatsoever. Again, BLM intended to "act first and study later," *National Parks*, 241 F.3d at 734. In that case, the court rejected an agency's reliance on a similar "research and monitoring program," concluding that there was "no evidence that the mitigation measures would significantly combat the mostly 'unknown' or inadequately known effects" of the project. *Id.* at 735. Here, as in that case, "[t]he EA's speculative and conclusory statements are insufficient to demonstrate that the mitigation measures would render the environmental impact so minor as to not warrant an EIS." *Id.* Where research is necessary to determine the extent of an unknown and possibly significant environmental risk, an EIS should be prepared so that the research can be done and the decision made in reliance on that information, rather than

the other way around. *See id.* at 732–33. BLM's reliance on an unwritten, untested, and unsupported monitoring plan in the face of unknown and possibly significant environmental impacts does not excuse its decision to forego an EIS. Moreover, it renders the agency's issuance of a FONSI arbitrary and capricious.

### iv. Cumulative Impacts

Plaintiffs also argue that the cumulative effects of this project will be significant, and that an EIS is therefore necessary. They point to additional privatization of BLM land under the LCLA and other acts of Congress, which is expected to result in more development, as well as planned construction of a power plant as actions having environmental impacts that could be cumulatively significant in combination with Phase I LCLA disposal. BLM responds that it adequately considered the impacts of all of these projects in the EA, and that NEPA does not require it to speculate as to the impacts of projects not yet fully developed.

▮▮▮▮ Under NEPA regulations, "cumulative impact" is defined as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. If several actions taken together have a cumulatively significant effect, this must be analyzed in an EIS. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998). Plaintiffs have identified more than enough evidence in the record to raise a "substantial question" as to

whether the cumulative impacts of this project are significant. In addition to the Phase I lands at issue here, another 7,007 acres of land will be privatized under Phase II of LCLA, land that would accommodate another 14,000 dwelling units. (AR 1275.) The Phase II lands directly abut desert tortoise ACECs. (*See* AR 1248.) Furthermore, BLM intends to transfer 10,540 acres of land directly to the City of Mesquite under the Mesquite Lands Act of 1986. (AR 1275.) These lands, located "immediately south and adjacent to a portion of the LCLA lands," also "would support master-planned residential community projects," as well as commercial, tourism-related, and other "public" uses. (AR 1275.) Finally, Toquop Energy proposed a power plant for construction just to the northwest of the LCLA lands,[10] and the City of Mesquite was "assessing the feasibility" of purchasing another 2,600 acres of BLM land for a new regional airport. (*Id.*) Taken together, these actions would open 36,747 acres for development and support a population in excess of 200,000 residents. (AR 1276.) Mesquite is already a fast-growing community. Between 1980 and 2000, its population increased—by a factor of nearly 17—from 922 to 15,506. (AR 1258.) The EA acknowledges that "[r]apid growth is expected to continue for the foreseeable future," and that by 2010, Mesquite's population could approach 39,000. (AR 1258.) To accommodate this growth, "expansion beyond the current limits of development would be required." (*Id.*) Although the EA insists that "the cumulative scenario does not . . . result in a fundamental acceleration in the pace of future development" (AR 1276), that pace is already breathtaking, and raises obvious questions as to cumulative environmental impacts.

Although all of these projects are listed in the EA, analysis of their effects is cursory. Given the limited groundwater resources to support development in the area, it is clear that the other development projects surrounding the LCLA lands will put even more pressure on those resources and increase the risk of hydrological impacts that are currently unknown. Furthermore, the EA does not even discuss air quality in its cumulative impacts analysis.[11] Instead of conducting a thorough analysis, BLM relies upon the same mitigation measures discussed above in concluding that the cumulative environmental impact of these various projects will not be significant. Indeed, the DR/FONSI states that "[t]he cumulative impacts of the action would not be significant, based on imple-

10. BLM contends in its reply that the Toquop plant is "in the preliminary planning stage" and therefore "hardly ripe . . . for meaningful cumulative impact analysis." (Def.'s Reply (#31) at 12:15–16 (citing the EA, AR 1275).) BLM neglects the very next sentence of the EA, however, in which it states that "[a]n EIS is currently being prepared by the BLM for this project." (AR 1275.) If the project was "ripe" enough to deserve its own EIS, it was clearly "ripe" enough to be analyzed as a reasonably foreseeable future project in other NEPA documents. Indeed, it seems that BLM should have possessed some information regarding the project's impacts, given that the agency was in the process of preparing an EIS for it. Furthermore, the agency's decision to prepare an EIS in and of itself shows that BLM regarded the potential impact of the project to be significant, either individually or cumulatively.

11. According to the EA, dust from construction, as well as increased vehicular emissions following development, "would decrease local air quality." (AR 1242.) The EA concludes in its analysis of Phase I's effects, however, that the Virgin River Valley area would remain in attainment of air quality standards because "nearby St. George, Utah," a municipality of about 50,000, is in attainment. (AR 1242.) The document does not address the potential for cumulative impacts to result in non-attainment, despite acknowledging that development could result in a population four times that number.

mentation of the Hydrologic Monitoring and Mitigation Plan, which would encompass ground water withdrawals from multiple activities in hydrologic basins within and near the Virgin River watershed." (AR 666.) There is no further discussion of cumulative impacts in the DR/FONSI. Once again, BLM may not base a finding of no significant impact on implementation of a mitigation plan that does not yet exist, is not supported by any data, and cannot be analyzed meaningfully. Furthermore, whatever the merits of the HMMP, it would do nothing to address potential cumulative impacts on air quality or desert tortoise habitat. BLM's decision not to prepare an EIS, in the face of reasonably foreseeable cumulative impacts that may be significant, was arbitrary and capricious.

### v. Analysis of Alternatives

Finally, plaintiffs claim that BLM failed to analyze alternatives to the proposed action, specifically the alternative of offering only 4,817 acres, the minimum Phase I acreage mandated by LCLA. *See* LCLA § 4(a)(2)(A), (b)(1)(A). BLM points out in response that LCLA severely constrained its ability to craft alternatives to the action.

▮▮▮ To be sure, LCLA imposes some limitations on BLM's ability to craft alternatives. A "no action" alternative, for instance, is not reasonable because LCLA mandates disposal of the lands. (*See* AR 1239.) Furthermore, LCLA's purposes include facilitating Mesquite's expansion plans and benefitting the County through increased residential and commercial development. LCLA § 2(a)(3), (4). BLM accordingly "eliminated from further analysis" a "Multiple Small Parcels Alterna-

tive" because it would be inconsistent with the "desire of the County for a planned residential community developed on LCLA lands," would "not facilitate" the development of "needed water, wastewater, and other public infrastructure," would fail to yield "the types of fiscal benefits envisioned by the County," and would be inconsistent with the City of Mesquite's long range development plan, "which the County intends to use as a link for development of the Phase I LCLA lands." (AR 1239.) BLM did not, however, consider the alternative of complying with the letter of LCLA by offering only 4,817 acres in Phase I. BLM refers to the IBLA's "June 18, 2002" order for its explanation. (Def.'s Opp'n/Cross–Mot. (# 22/23) at 27:2–3.) No order bearing that date appears in the record, but the IBLA's order of January 18, 2002, does reveal that BLM divided Parcels A and B along the paved road leading to the Mesquite landfill, and added additional acreage to Parcel B "because of BLM's desire to have more than one large parcel." *W. Land Exch. Project et al.,* No.2002–7 at *3 (I.B.L.A. Jan. 18, 2002). It is significant that BLM can point to nothing in the record documenting this decision, and instead relies on arguments made to an appellate body and quoted back in that body's order after the fact to support its decision.[12] BLM obviously considered and rejected the 4,817–acre alternative, but the EA and the rest of the record are silent as to BLM's reasons. Thus the public never heard or commented on those reasons, and one of the fundamental aspects of BLM's action—the number of acres to offer, and the decision to go beyond the requirements of LCLA—was never made part of the NEPA analysis. BLM's omission of this analysis from the

12. The parties stipulated that the January 18, 2002 IBLA order would be stricken from the administrative record because it was "not used or consulted during [BLM's] decision-making." (*See* Stipulation and Order (# 26) at 2.) BLM resubmitted the decision as Exhibit B to its Reply (# 31).

EA was arbitrary and capricious, and frustrated the purposes of NEPA.

Furthermore, although the "No Action" alternative clearly did not require much analysis in this case, BLM did not consider any alternative that would not have facilitated the maximum level of residential and commercial development on the LCLA lands. Granted, the provisions of LCLA tend to favor development, and require BLM to work with local land use plans, all of which seem geared toward maintaining the current rate of population growth around Mesquite. Moreover, the court recognizes that particular, detailed plans for development of the land do not yet exist, and that BLM reasonably relied upon population density and water usage assumptions derived from the long-range development plans that LCLA required it to follow anyway. All that said, some additional discussion in the EA as to why BLM did not consider less intensive development (at least prior to developing its arguments in this litigation) would have been more useful to the public and more consistent with the informational purposes of NEPA. Again, this is a choice made implicit rather than explicit by the EA. BLM should have revealed the process that led to this decision.

## D. Adequacy of the EA

Because the court has determined that BLM's decision not to prepare an EIS was arbitrary and capricious, it has already found that the EA was inadequate to support that decision, and need not consider the parties' other specific arguments as to the adequacy of the EA.

## E. Plaintiffs' Request for Injunctive Relief

Plaintiffs move this court for an order directing BLM "to develop an EIS before undertaking any additional action to dispose of the Phase I parcels," and request that the court "retain jurisdiction to dissolve the injunction upon finding that such EIS ... is adequate." (Pls.' Mot. (# 20) at 28:8–12.) Aside from defending its actions on the merits, BLM does not address this request for relief.

The Supreme Court has rejected any presumption that irreparable injury flows from an agency's failure to evaluate thoroughly the environmental impacts of its decision, and instead has applied traditional equitable balancing in determining whether to issue an injunction pending further analysis. *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 544–45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).[13] As the Court summarized, "the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 542, 107 S.Ct. 1396. The Court also recognized, however, that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently

---

**13.** Plaintiffs invoke *Save Our Ecosystems v. Clark,* 747 F.2d 1240 (9th Cir.1984), in support of their claim that "[i]rreparable damage is presumed to flow from a failure to properly evaluate the environmental impact of a major federal action." (Pls.' Mot. (# 20) at 28:15–16.) This is precisely the presumption, and even the very case, that the Supreme Court rejected in *Amoco Production. See Amoco* Prod. Co., 480 U.S. at 541, 544–45, 107 S.Ct. 1396. Although *Amoco Production* was not a NEPA case, its reasoning has been adopted by the Ninth Circuit as controlling for purposes of NEPA. *See Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722, 737 & n. 18 (9th Cir. 2001). The continuing vitality of the presumption cited by plaintiffs is therefore very much in doubt.

likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. 1396. Following this analysis, the Ninth Circuit has held that where a court has required preparation of an EIS, "allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir.2001). Furthermore, "because NEPA is a purely procedural statute, the requisite harm is the failure to follow the appropriate procedures." *Id.* at 737 n. 18 (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir.1989)). This court takes the Ninth Circuit's pronouncements in *National Parks* to mean that where an EIS is required due to the potential for significant environmental harm, irreparable harm to the environment may well result if the project is allowed to proceed in the absence of the informed environmental analysis that an EIS would provide.

 This court already has held that an EIS is required because plaintiffs have raised a substantial question as to whether the impacts of the action will be both individually and cumulatively significant. Because the IBLA declined to stay this action pending resolution of CIHD's appeal more than two years ago, there is nothing to stop the BLM from immediately issuing the patent to Parcel C, and once again offering Parcels A and B for sale, without any further environmental analysis. Therefore, irreparable harm to the environment may well occur in the absence of an injunction. Legal remedies also are inadequate; no party is advancing any theory under which the plaintiffs here could recover money damages for BLM's violation of their procedural rights under NEPA and their concrete interests in this action.

The court must balance these harms, however, against the potential harm that BLM might suffer were this court to grant an injunction. Although BLM has not provided any argument on this point, some possible harm is implicit in the record and in BLM's other contentions. Specifically, an injunction against disposing of the land pending preparation of an EIS would cause BLM to fall even further behind the disposal schedule mandated by LCLA. Congress directed BLM not merely to offer for sale, but rather to "dispose of," the Phase I LCLA lands within one year of the act's passage (i.e., October 13, 2001). LCLA § 4(a)(2). As far as this court knows, BLM has not reoffered Parcels A and B, and has not yet patented Parcel C. The agency is thus already about two and one-half years behind schedule, despite the fact that no decision of any court or administrative body has constrained its ability to take action. Aside from the rather ephemeral harm posed by being out of compliance with LCLA, the record does not show that any harm to BLM has accrued from this delay, which at least to this point has been largely of the agency's own making. The balance of harms here tips sharply in favor of the plaintiffs.

Finally, this court also will consider the public interest, insofar as an injunction would affect several entities and interests not represented in this case. First, the successful high bidder on Parcel C would not receive patent to the land if an injunction were to issue. Plaintiffs are correct, however, that the bidder was aware that his or her ability to take title might be affected by pending appeals. (*See* AR 806.) The bidder thus took a calculated risk in putting up the 20 percent deposit, and knew that issuance of patent might be delayed. In any event, it is not clear from the record that the bidder's deposit will be forfeited; indeed, it appears that once BLM complies with NEPA, it may patent

the parcel to the same successful high bidder at the agreed-upon price. Second, Lincoln County and the City of Mesquite both have interests in the continued economic development of the region, and an injunction here may delay somewhat the tax and infrastructural benefits that those governments foresaw from development of the LCLA lands. BLM's lack of compliance with environmental law and insistence on a forfeitable deposit, however, created a cloud over title to the land and dissuaded developers from bidding. In this light, the court can see a real benefit to all of these parties from preparation of a full EIS. If done properly, such a document would not only dispel the uncertainty surrounding the legality of the land sale, but also inform potential bidders and developers about the extent of the commitments required to comply with the various management, monitoring, and mitigation plans contemplated by BLM and other agencies. In other words, an EIS could enable bidders to make more informed investment choices, and thereby advance the County's and City's interests in economic development, whereas an inadequate environmental analysis predicated on mitigation measures not yet in existence only perpetuates a degree of uncertainty that dissuades investment.

On balance, therefore, this court finds that the equities favor issuance of an injunction against disposal of the Phase I LCLA parcels pending preparation of an EIS.

**F. Plaintiffs' Request for Attorneys' Fees and Costs**

This court cannot make a decision regarding a fee award on the record before it, but will entertain a proper motion for attorneys' fees and costs from the plaintiffs within 14 days of the date of this order. *See* LR 54-16.

### III. *Conclusion*

Accordingly, **IT IS ORDERED** that plaintiffs' motion for summary judgment (# 20) be **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's cross-motion for summary judgment (# 22/23) be **DENIED**.

**IT IS FURTHER ORDERED** that a declaratory judgment be entered to the effect that BLM's decision not to prepare an EIS for disposal of the Phase I LCLA lands was arbitrary, capricious, and otherwise not in accordance with law, in violation of the National Environmental Policy Act and the Administrative Procedure Act.

**IT IS FURTHER ORDERED** that BLM is enjoined from offering for sale, or issuing patent to, any of the Phase I LCLA lands prior to preparing an EIS that complies with the requirements of NEPA and this court's order.

**IT IS FURTHER ORDERED** that this court shall retain jurisdiction to dissolve the injunction upon a finding that these requirements have been met.

Let judgment be entered accordingly.